IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 4, 2015 Session

## STATE OF TENNESSEE v. MECHELLE L. MONTGOMERY

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Williamson County**
**No. IICR076574     James G. Martin III, Judge**

_____

**No. M2013-01149-SC-R11-CD - Filed March 27, 2015**

_____

The defendant, who was indicted for driving under the influence and violating the open container law, moved to suppress all evidence discovered during the search of her car, which included an open container of alcohol and a small amount of marijuana. The trial court granted the motion to suppress, holding that one of the officers involved had unreasonably prolonged the investigatory stop. The Court of Criminal Appeals affirmed. Because the officer had a reasonable basis for extending the stop by ten to fifteen minutes while awaiting a second officer and the duration of the detention did not exceed the proper parameters, we set aside the order of suppression and remand to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Case Remanded to the Trial Court**

GARY R. WADE, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined. JEFFREY S. BIVINS, J., not participating.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; James E. Gaylord and Leslie E. Price, Senior Counsel; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; and Carlin C. Hess, Assistant District Attorney General, for the appellant, State of Tennessee.

Lee Ofman, Franklin, Tennessee, for the appellee, Mechelle L. Montgomery.

### OPINION
### I. Facts and Procedural History

Mechelle Montgomery (the "Defendant"), who was indicted by the Williamson County Grand Jury for driving under the influence, Tenn. Code Ann. § 55-10-401 (2012 & Supp. 2014), and violating the open container law, id. § 55-10-416 (2012 & Supp. 2014),

moved to suppress all evidence resulting from the search of her car. At the hearing on the motion to suppress, Officer David Reiman, a deputy with the Williamson County Sheriff's Office, was the only witness to testify.

At approximately 3:00 p.m. on the date of the arrest, Officer Reiman learned through dispatch that a woman named Corey Brown, who lived on Trinity Road in Williamson County, had called 911 to report an "unwanted person" at her residence. Ms. Brown stated that she and her boyfriend had observed in their driveway a black Ford Mustang driven by the Defendant, who had previously been in a relationship with Ms. Brown's boyfriend. Because the Defendant had harassed her before, Ms. Brown expressed fear that "there was going to be a conflict." According to the dispatch, Ms. Brown identified the Defendant by name and indicated that there appeared to be a passenger in the Defendant's vehicle. Ms. Brown further stated that she believed the Defendant to be intoxicated "based on a conversation [that she] had had with her."

In response to the call, Officer Chris Shoap took the lead in the ensuing investigation, while Officer Reiman acted as backup. As the officers drove toward the Brown residence in separate vehicles, they observed a black Ford Mustang with two female occupants parked in a church parking lot on Trinity Road. Officer Shoap continued on to the residence while Officer Reiman drove into the church lot and parked his patrol car to the side of the Mustang so as not to block its exit. He did not activate his blue lights. Officer Reiman then approached the driver's side window and asked if either of the women was Mechelle Montgomery. When the Defendant, who occupied the driver's seat, identified herself, Officer Reiman detected the smell of alcohol, which he believed "to be coming from [the Defendant]." Officer Reiman described the Defendant's eyes as "watery" and her speech as "slightly slurred." When Officer Reiman asked the Defendant and the passenger for identification, they handed over their driver's licenses. Officer Reiman retained the licenses for "ten to fifteen minutes," but he otherwise took no action until Officer Shoap returned.

When Officer Shoap arrived, he asked the Defendant to step out of her car and then conducted a series of field sobriety tests. Afterward, Officer Shoap asked the Defendant to sit in the back of his patrol car. He did not apply handcuffs. Officer Reiman stated that he believed the Defendant to be "under arrest and not free to leave at that point." He further testified that he and Officer Shoap detected the odor of "burnt marijuana in and about the vehicle." The officers conducted a search, finding a Burger King cup in the center console containing an alcoholic beverage and a "hand-rolled . . . marijuana joint" under the passenger-side floor mat. During cross-examination, Officer Reiman described the location of the Brown residence as "[j]ust a little farther down" Trinity Road from the church parking lot. He confirmed that he had neither spoken to Ms. Brown nor visited her residence, and that his information was based on what dispatch had communicated to him by radio.

-2-

Because the audio and video recordings taken from Officer Reiman's patrol car had not yet been provided to defense counsel, the hearing was continued for almost three months. At the reconvened proceeding, Officer Reiman testified that when he approached the Mustang, the key was in the ignition and the engine was in operation. He confirmed that his initial interaction with the Defendant led him to suspect "that [she] was driving under the influence of alcohol," but "[b]ecause the call was [Officer] Shoap's," Officer Reiman chose to await his return. Officer Reiman acknowledged that after he took possession of the driver's licenses, he commented, "[W]e're going to hang out here for a little bit." Although Officer Reiman had previously testified that it had taken Officer Shoap approximately ten to fifteen minutes to return to the church lot, he could not state with certainty at the second proceeding how long he had detained the Defendant while waiting for Officer Shoap. While Officer Shoap was performing the field sobriety tests, Officer Reiman "assisted by supervising [and] making sure the scene was safe." The video recording of the field sobriety tests was admitted into evidence and played during the hearing. Officer Reiman expressed the opinion that the Defendant "did not do well" on the tests. He did recall, however, that the Defendant had mentioned suffering from nerve damage that affected her speech and balance, a condition for which she had been prescribed medication.

The trial court granted the Defendant's motion to suppress, ruling, in pertinent part, as follows:

> The Court does not know how much time passed between the initial encounter between [Officer] Reiman and [the Defendant] and the arrival of [Officer] Shoap, whether it was ten (10) or fifteen (15) minutes, or a shorter time or a longer time. However, the length of passage of time is irrelevant. [The Defendant] was not free to leave. Even though her vehicle may not have been blocked by the position of [Officer] Reiman's vehicle, [Officer] Reiman was in possession of [the Defendant's] driver's license . . . .
>
> . . . .
>
> . . . When he seized [the Defendant], [Officer] Reiman had available to him the information which had been relayed by the 911 dispatcher regarding an "unwanted person." The information was allegedly attributable to the girlfriend of [the Defendant's] former boyfriend which, on its face, would have questionable merit. [Officer] Reiman observed at the time of his encounter with [the Defendant] that she was seated in the driver's side of the vehicle, the engine to the vehicle was running, her speech was slightly slurred, and she had watery eyes. Based upon the information available to him, including his

-3-

observations of [the Defendant] and the totality of the circumstances, [Officer] Reiman elected not to further investigate, conduct field sobriety tasks, or charge [the Defendant] with a criminal offense. Instead, . . . [he waited] until [Officer] Shoap arrived, communicate[d] his observations to [Officer] Shoap, and let [Officer] Shoap make [the appropriate] decision . . . . As a consequence, [Officer] Reiman did not make a brief investigatory detention based upon information available to him. . . .

. . . Because [Officer] Shoap did not testify, the basis for his decision cannot be discerned by the Court without speculation. However, [Officer] Reiman's seizure of [the Defendant] and his holding her for the arrival of [Officer] Shoap was without lawful authority.

In a split decision, the Court of Criminal Appeals affirmed the trial court, holding that the State had "failed to meet its burden of establishing by a preponderance of the evidence that it was reasonable for Officer Reiman to detain [the Defendant] without investigating either the possible trespassing or the suspected DUI." State v. Montgomery, No. M2013-01149-CCA-R3-CD, 2014 WL 954929, at *9 (Tenn. Crim. App. Mar. 12, 2014). We granted the State's application for permission to appeal to determine whether the investigatory stop was reasonable.

## II. Standard of Review

The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact after a suppression hearing, its conclusions are binding upon this Court unless the evidence in the record preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. When the findings of fact are based entirely on evidence that does not involve issues of witness credibility, an appellate court conducts a de novo review. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Review of a trial court's application of law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)).

## III. Analysis

Both the federal and state constitutions provide protections from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable, and any evidence discovered by virtue thereof is subject to suppression. See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn.

Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule . . . is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997) ("[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.").

"This Court has recognized three categories of police interventions with private citizens: (1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012). "While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). Even when there is no basis for suspecting criminal activity, an "officer may approach an individual in a public place and ask questions without implicating constitutional protections." State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" Daniel, 12 S.W.3d at 424 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In determining whether a seizure has occurred, the key question is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425.

A seizure that qualifies as a brief investigatory detention will be upheld so long as the seizing officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be committed. Terry, 392 U.S. at 21; State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998). Reasonable suspicion is an objective standard evaluated in light of the totality of the circumstances surrounding the seizure, which may include an officer's observations, information from other law-enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, deductions based upon experience, and the nature of the suspected crime. State v. Williamson, 368 S.W.3d 468, 474-75 (Tenn. 2012). In addition to requiring that a seizure be "justified at its inception," an investigatory detention must remain "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. A

detention that is reasonable at the outset "can become unreasonable and constitutionally invalid 'if the time, manner[,] or scope of the investigation exceeds the proper parameters.'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001)). When assessing the reasonableness of the duration or scope of a detention, "the proper inquiry is whether . . . the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Simpson, 968 S.W.2d at 783.

In this instance, the officers, in response to a dispatch, observed a car in a church parking lot matching the description of the vehicle driven by a suspected trespasser reported to be "intoxicated." Officer Reiman pulled into the church lot to investigate while Officer Shoap, the lead officer, went to the Brown residence, the site of the alleged trespassing incident. Officer Reiman parked his patrol vehicle so as not to block the Defendant's car, refrained from activating his blue lights, and approached the car to ascertain the identity of the occupants. After detecting an odor of alcohol and observing the Defendant's slurred speech and watery eyes, Officer Reiman took possession of the Defendant's driver's license, explaining, "[W]e're going to hang out here for a little bit." In our view, Officer Reiman seized the Defendant at that point. See Daniel, 12 S.W.3d at 427 (holding that a consensual encounter "mature[d] into a seizure" when an officer retained possession of the defendant's license to run a warrants check).

At the time Officer Reiman seized the Defendant, he had the following information pertaining to her possible criminal activity: (1) he was aware that Ms. Brown had indicated that the Defendant was intoxicated based on an earlier conversation between the two; (2) he had observed the Defendant in the driver's seat of the Mustang with the engine engaged; and (3) he had detected the odor of alcohol and had observed other signs of intoxication, including the Defendant's watery eyes and slurred speech. Although the Defendant does not challenge the sufficiency of these circumstances as justification for the investigatory detention, she argues that Officer Reiman unreasonably prolonged her detention by waiting for Officer Shoap instead of taking immediate steps to confirm or dispel his suspicions regarding her possible criminal activity. The State argues that Officer Reiman did not unreasonably prolong the detention when he waited approximately ten to fifteen minutes for Officer Shoap to return to the scene.

The United States Supreme Court confronted a similar set of facts in United States v. Sharpe, which involved a state highway patrolman assisting a federal DEA agent in the pursuit of two suspects believed to be transporting marijuana. 470 U.S. 675, 677-78 (1985). The officers became separated, and the patrolman later stopped the suspected vehicle. Id. at 678. The patrolman detained the occupants of the vehicle, took possession of their driver's licenses, and waited for approximately fifteen minutes pending the arrival of the DEA agent.

Id. at 678-79. When the DEA agent arrived, he placed his weight on the rear of the suspects' vehicle, thereby determining that it was overloaded, and sniffed the rear window, detecting the odor of marijuana. Id. at 679. During a subsequent search of the vehicle, officers found over a ton of marijuana. Id. The Court ruled that "[i]t was appropriate for the [state patrolman] to hold [the suspects] for the brief period pending [the DEA agent's] arrival," especially given that the DEA agent had expertise in drug stops and the patrolman "could not be certain that he was aware of all of the facts" regarding the suspects' possible criminal activity. Id. at 687 n.5. Moreover, the Court cautioned judges against using "a *post hoc* evaluation of police conduct . . . [to] imagine some alternative means by which the objective of the police might have been accomplished." Id. at 686-87. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Id. at 687.

The Defendant insists that Officer Reiman acted unreasonably because he should have conducted the field sobriety tests on his own instead of holding the suspects for a brief period pending the arrival of Officer Shoap. We do not agree. Officer Reiman knew that Officer Shoap, the lead officer on the call, was "just . . . down the road" from the site of the investigatory detention. The record corroborates that testimony, establishing that the Brown residence is at 125 Trinity Road and that the church is at 147 Trinity Road. It was reasonable for Officer Reiman to wait a short period to find out whether Officer Shoap had acquired additional information at the Brown residence. Moreover, by waiting for Officer Shoap, Officer Reiman was able to "assist[] by supervising [and] making sure the scene was safe" while Officer Shoap conducted the field sobriety tests. Finally, it was prudent for Officer Reiman to wait for a second officer given the presence of a passenger inside the Defendant's vehicle. See Michigan v. Long, 463 U.S. 1032, 1047 (1983) ("[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers."). Under these circumstances, Officer Reiman had a reasonable basis for waiting ten to fifteen minutes[1] for Officer Shoap rather than completing the investigation on his own. Cf. Thompson v. Commonwealth, No. 2004-SC-1070-MR, 2005 WL 2675032, at *3 (Ky. Oct. 20, 2005) (holding that an officer acted reasonably when he detained suspects "for approximately fifteen minutes while waiting for backup and for additional information [regarding the ownership of the suspects' vehicle]"); State v. Sera, 43-704, p. 9-10 (La. App. 2 Cir. 10/29/08); 997 So. 2d 707, 712 (concluding that a "detention was not unduly prolonged" where an officer delayed a search by ten minutes to wait for backup); Hartman

---

[1] Although the trial court did not make a finding as to how long Officer Reiman waited for Officer Shoap to return to the scene, nothing in the record contradicts Officer Reiman's initial estimate of ten to fifteen minutes. Further, the trial court did not question the veracity of any portion of Officer Reiman's testimony. Accordingly, we accept his testimony that approximately ten to fifteen minutes elapsed while he waited for Officer Shoap.

v. State, 144 S.W.3d 568, 573-74 (Tex. Ct. App. 2004) (holding that an officer did not unreasonably prolong a detention by delaying field sobriety tests by five to fifteen minutes while waiting for backup).

In our view, the duration of the detention did not exceed "the proper parameters," Troxell, 78 S.W.3d at 871, and the officers acted with reasonable diligence in their efforts to substantiate their suspicions, see Simpson, 968 S.W.2d at 783. We conclude, therefore, that the record preponderates against the finding of the trial court that the officers unreasonably prolonged their investigatory detention of the Defendant.

## IV. Conclusion

Because the duration of the investigatory stop was not unreasonable under the circumstances, the order of suppression is reversed and the case is remanded to the trial court for further proceedings. It appearing that the Defendant is indigent, costs are taxed to the State of Tennessee.

_____
GARY R. WADE, JUSTICE