IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2018

FILED
10/12/2018
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. RAYMOND ROBERT CREPACK

**Appeal from the Circuit Court for Sevier County**
**No. 20306-III     Rex Henry Ogle, Judge**

_____

### No. E2017-02236-CCA-R3-CD

_____

Following the denial of his motion to suppress, the Defendant-Appellant, Raymond Crepack, was convicted as charged by a Sevier County Circuit Court jury in Count 1 of driving under the influence (DUI by impairment), third offense, T.C.A. § 55-10-401(1); in Count 2 of driving while the alcohol concentration in his blood or breath was 0.08% or more (DUI per se), third offense, id. § 55-10-401(2); in Count 3 of violating the open container law, id. § 55-10-416, and in Count 4 of driving while his license was cancelled, suspended, or revoked for a prior DUI conviction, id. § 55-50-504(a)(1). The trial court merged the conviction for DUI per se, third offense, with the conviction for DUI by impairment, third offense, and sentenced Crepack[1] to concurrent sentences of eleven months and twenty-nine days to be served at 100%, to thirty days for the open container violation, and to six months for the driving on a revoked license conviction. On appeal, Crepack argues: (1) the trial court erred in denying his motion to suppress because the investigatory stop, which was based upon reports from an anonymous caller, amounted to an improper seizure without independent corroboration of his "poor driving," and (2) the sentence for his DUI, third offense, conviction is excessive. After review, we remand the case for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**
**and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Amber D. Haas, Assistant Public Defender, for the appellant, Raymond Robert Crepack.

_____

[1] We acknowledge that we do not use titles when referring to the defendant or witnesses, but we intend no disrespect in doing so. Judge John Everett Williams believes that referring to the defendant or witnesses without proper titles is disrespectful even though none is intended. He would prefer that these individuals be referred to as Mr. or Mrs. or by his or her proper title.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Brad Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

After receiving two reports from an anonymous caller[2] about a reckless, possibly impaired driver, the police stopped Crepack and, following a brief investigation, arrested him for DUI, violating the open container law, and driving while his license was revoked for a prior DUI conviction. Crepack was subsequently charged by presentment and filed a motion to suppress all evidence obtained following his stop.

**Motion to Suppress.** At the suppression hearing, Deputy Carl Yoakum with the Sevier County Sheriff's Office testified that on January 11, 2015, he was dispatched to investigate a possible impaired driver on Newport Highway. At the time, he was given a vehicle description, tag number, and a description of the driver. While en route to that location, Deputy Yoakum received a second dispatch that the suspect vehicle had stopped at the New Center Market in Sevier County.

Upon arriving at the market, Deputy Yoakum identified a suspect vehicle and driver matching the descriptions that he had been given. Deputy Yoakum parked in a parking spot to the left of the suspect vehicle but did not activate his blue emergency lights. When Deputy Yoakum exited his patrol car, Crepack put his vehicle in reverse and began backing out of his parking space. Deputy Yoakum asked Crepack to stop, and he complied. At that point, Deputy Yoakum approached Crepack's vehicle and saw a cup of what appeared to be a beer between Crepack's legs.

Deputy Yoakum asked Crepack to exit his vehicle, which he did. He noticed that Crepack had slurred speech and was "a little unsteady" on his feet when exiting his vehicle. In addition to the cup of what appeared to be beer, he noticed an open beer can or bottle in the passenger seat of Crepack's vehicle. Deputy Yoakum said that approximately eighteen minutes passed from the time he was initially dispatched to investigate the possibly impaired driver to the time he made contact with Crepack. He added that he was in the New Center area of Newport Highway when he received the initial dispatch. Deputy Yoakum confirmed that he never activated his blue emergency lights during his entire interaction with Crepack.

---

[2] The record is silent as to whether this caller wished to remain anonymous when providing the two reports to law enforcement. However, because no identifying information regarding this caller was included in the record, we will treat this individual as an anonymous caller for the purposes of this appeal.

At the conclusion of the suppression hearing, the trial court denied the motion to suppress, stating:

> [T]he Court does think that the officer was well within his rights for purposes of this stop. The information that he did receive, I think created reasonable suspicion for him to further investigate, and then once he began his investigation, the Court does think that probable cause was created, and that acting upon that probable cause he conducted a further investigation from which gave him the necessary facts to allow him to search and then ultimately arrest this defendant.

**Trial.** Because some of the trial proof substantially conformed to the evidence offered at the suppression hearing, we will summarize only the evidence relevant to this appeal that is distinguishable.

Deputy Yoakum testified that on January 11, 2015, he was dispatched to investigate "a reckless driver, possibly impaired driver" on Newport Highway. However, before he got to that area, he received new information from the anonymous caller, who was on the telephone with dispatch, that the suspect vehicle had pulled into the New Center Market. This caller informed dispatch that the suspect vehicle was "a red or burgundy Chevy Lumina" and provided the tag number for the vehicle and a physical description of the driver of the suspect vehicle.

Deputy Yoakum said that he was able to locate a vehicle and driver matching this description in the New Center Market parking lot and that he parked his patrol car beside this vehicle. As Deputy Yoakum exited his vehicle, Crepack, who was sitting in the driver's seat with the engine running, put his vehicle in reverse. Deputy Yoakum asked him to stop, and Crepack complied. When Deputy Yoakum approached Crepack's vehicle, he observed a cup containing what appeared to be beer and a large, open beer bottle in the passenger seat. Deputy Yoakum said he could smell beer as he approached Crepack's vehicle and noticed that Crepack had "slurred speech." Upon asking Crepack to exit his vehicle, Deputy Yoakum noticed that Crepack "was unsteady on his feet." He stated that Crepack's actions were "consistent with someone who was impaired."

Deputy Yoakum said Crepack told him that "he was driving home from White Pine and that he had stopped there to get some beer on his way home, and that . . . while he was in White Pine[,] he drank two . . . 24-ounce beers." At that point, Deputy Yoakum asked Crepack to perform some field sobriety tests, and Crepack agreed.

Deputy Yoakum administered the "walk-and-turn" test and the "one-leg stand" test, and when Crepack "performed poorly" on both tests, he arrested Crepack for DUI.

When Deputy Yoakum checked the status of Crepack's driver's license, he discovered that Crepack's license had been revoked. He read Crepack the implied consent form and asked if he would consent to a blood or breath test, and Crepack consented. Deputy Yoakum then took Crepack to LeConte Medical Center to have his blood drawn, and this blood sample was forwarded to the Tennessee Bureau of Investigation (TBI) for testing.

Deputy Yoakum acknowledged that he never observed Crepack driving on the roadway and never talked to the complainant in this case. He also said he never collected the substance in the cup in Crepack's car as evidence.

Jamie Rash, an employee in the toxicology unit of the TBI, was accepted as an expert in toxicology and testified that Crepack's blood sample contained ethyl alcohol at "0.179 gram percent." She added that "the legal limit [for blood alcohol content] in Tennessee is "0.08 gram percent."

The defense presented no proof. At the conclusion of trial, Crepack was convicted as charged.

**Sentencing.** At the sentencing hearing that occurred immediately after the conclusion of trial, the State reiterated that Crepack's blood alcohol level was well over the legal limit and informed the court that Crepack had been arrested six times for DUI, had four prior DUI convictions, and had a prior implied consent violation. The State added that when Crepack committed the DUI offense in this case, he was driving on a license that had been revoked for a prior DUI conviction. Given these facts, the State asked that the court impose the maximum sentence of eleven months and twenty-nine days to be served in jail.

Although the defense did not contest Crepack's prior DUI convictions, it argued that at least two of those convictions were outside the time frame to enhance Crepack's DUI in this case. It also asserted that Crepack was "gainfully employed" and that he lived with his mother, who was "dependent on him to provide her with help around the house and income." After asserting that "there [was] a substantial amount of time between each of these convictions" and that there was "[o]bviously . . . a drinking issue here," the defense requested that Crepack "attend and complete an inpatient treatment program and get credit for that time." The defense also asked that the court sentence Crepack to the minimum sentence for the DUI, third offense.

During the sentencing hearing, Crepack made the following allocution: "Like I said, my mom is real sick, and I wasn't drunk that day. But I've got a job. I do have a drinking problem, but I don't drink and drive, but I do need some help with that." When

the trial court reminded Crepack that he had an open container of beer in his car at the time of the stop in this case, Crepack said, "I don't do that all the time."

The trial court found that this was Crepack's "third [DUI] conviction within the limits prescribed by Tennessee law[,]" which meant that he would receive an enhanced sentence. See id. § 55-10-405. It also noted that in addition to the DUI convictions within the limits, Crepack's criminal history included other DUI convictions. The court also recognized that Crepack had a blood alcohol level that was "more than double" the legal limit and that at the time of his arrest, he was driving on a license that had been revoked for a previous DUI. The trial court then found that based upon "the totality of the circumstances" and in light of Crepack's "various and numerous convictions," it was imposing a sentence of eleven months and twenty-nine days served at 100% for the DUI, third offense. The court also sentenced Crepack to concurrent sentences of six months for the driving on a revoked license conviction and thirty days for the open container violation.

The record shows that Crepack filed a timely motion for new trial, which was denied. Crepack also filed a timely notice of appeal.

## ANALYSIS

**I. Motion to Suppress.** Crepack argues that the trial court erred in denying his motion to suppress. Specifically, he claims that all evidence obtained during the course of his encounter with the officer should be suppressed because the stop, which was based on reports from an anonymous caller, amounted to an improper seizure without independent corroboration of his "poor driving." The State counters that the caller's reports, which were sufficiently corroborated, allowed Deputy Yoakum to initiate a consensual encounter with Crepack, wherein he developed reasonable suspicion of criminal activity after observing an open container of beer inside Crepack's vehicle. Alternatively, the State contends that because the anonymous caller's reports were adequately corroborated, Deputy Yoakum had reasonable suspicion to seize Crepack. Although this is an extremely close case, we nevertheless conclude that the officer's contemporaneous corroboration of several details from the anonymous caller's two reports, along with the officer's observation of Crepack's behavior in the parking lot, created reasonable suspicion for the investigatory stop.

Initially, we note that Crepack failed to include the transcript of the motion for new trial hearing in the appellate record. The appellant has the burden of preparing a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). If an incomplete record is presented to this court, the appellant risks waiving the issues raised

on appeal. State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). Here, the State has not argued that Crepack waived his issues by failing to include this transcript, and the appellate record contains the transcripts of the suppression motion and trial, Crepack's motion and amended motion for new trial, and the trial court's order denying the motion for new trial. The record also reflects that the trial court held a hearing on Crepack's motion for new trial before denying this motion. We recognize that a record may be sufficient for our review despite the absence of a relevant transcript. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012). Because we believe the record in this case is adequate for our review, we will address Crepack's issue on its merits, waiver notwithstanding.

A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. Moreover, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Bishop, 431 S.W.3d 22, 35 (Tenn. 2014); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

Both the Fourth Amendment of the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). It is well established that Article 1, section 7 is identical in intent and purpose to the Fourth Amendment. State v. Reynolds, 504 S.W.3d 283, 312 (Tenn. 2016); State v. McCormick, 494 S.W.3d 673, 683-84 (Tenn. 2016).

In determining whether a search or seizure has violated constitutional protections, we recognize that "'[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Kentucky v. King, 563 U.S. 452, 459 (2011) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)); see Reynolds, 504 S.W.3d at 304. "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or

seizure and the nature of the search or seizure itself.'" Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). Under both the United States Constitution and the Tennessee Constitution, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). The State bears the burden of proving that the warrantless search or seizure is constitutional. State v. Nicholson, 188 S.W.3d 649, 656-57 (Tenn. 2006).

Initially, we note that "the warrant requirements of the federal and state constitutions are implicated only when a search or seizure actually occurs." McCormick, 494 S.W.3d at 679 (citing State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008); State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000)). Tennessee has recognized three levels of police-citizen interactions: "(1) the full-scale arrest, which must be supported by probable cause; (2) the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing; and (3) the brief police-citizen encounter, which requires no objective justification." Day, 263 S.W.3d at 901 (citing Daniel, 12 S.W.3d at 424). However, only the full-scale arrest and the brief investigatory detention "rise to the level of a 'seizure' for constitutional analysis purposes." Id.

In considering this suppression issue, we must first determine whether Deputy Yoakum's actions in parking beside Crepack's vehicle and asking him to stop amounted to a warrantless seizure or constituted a consensual police-citizen encounter. See McCormick, 494 S.W.3d at 679. If the officer's actions amounted to a consensual interaction, then the protections against unreasonable searches and seizures are not implicated. Id. (citing Day, 263 S.W.3d at 901). Conversely, if the officer's actions constituted a seizure, then Crepack's warrantless seizure is presumed unreasonable unless the State can demonstrate that the seizure was conducted pursuant to one of the exceptions to the warrant requirement. Id. (citing King, 563 U.S. at 460; Day, 263 S.W.3d at 901 n.9; Nicholson, 188 S.W.3d at 656; Yeargan, 958 S.W.2d at 629).

A seizure occurs, for the purposes of the Fourth Amendment and article I, section 7, when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." State v. Hawkins, 519 S.W.3d 1, 33-34 (Tenn. 2017) (footnote omitted) (citations and internal quotation marks omitted); see State v. Randolph, 74 S.W.3d 330, 336 (Tenn. 2002) (The pertinent inquiry is "whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" (quoting Daniel, 12 S.W.3d at 425)). As the Tennessee Supreme Court stated,

This test is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."

Daniel, 12 S.W.3d at 426 (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)). This test is "objective" because it "requir[es] courts to examine the circumstances from the perspective of a reasonable person, and the subjective motivations and perspectives of police officers are irrelevant when not 'conveyed to the person confronted.'" Hawkins, 519 S.W.3d at 35 (citing and quoting Chesternut, 486 U.S. at 574, 575 n.7).

Factors relevant in determining whether a seizure has taken place include "the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen." Daniel, 12 S.W.3d at 425-26. "[C]ourts have consistently held that the Fourth Amendment is not implicated and no seizure occurs when police approach an individual, in a public place, or in a parked car, ask questions, and request to search, so long as police do not convey a message that compliance with their requests is required." Id. at 426 (footnotes omitted). However, courts have generally held that an encounter becomes a "seizure" if the officer:

(1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

Id. (citing generally 4 Wayne R. LaFave, Search & Seizure § 9.3(a) at 104 (3d ed. 1996 & Supp. 1999) (collecting cases) (hereinafter LaFave § ___ at ___) (currently located at LaFave § 9.4(a) at 586-589 (5th ed. 2012)). "Although police need not have reasonable suspicion of illegal activity to approach a vehicle stopped in a public place and ask the occupant questions, . . . when police stop a moving vehicle, a seizure implicating the protection of both the state and federal constitutions has occurred." Id. n.6 (citing Yeargan, 958 S.W.2d at 630; Delaware v. Prouse, 440 U.S. 648, 654 (1979)); see LaFave § 9.4(a) at 599 n.128 (5th ed. 2012) (collecting cases and specifically emphasizing State v. Pierce, 787 A.2d 1284, 1287 (Vt. 2001), which held that although the officer "had not

activated the cruiser's blue lights," he "did tell the defendant verbally and by gesturing that he was not free to leave" at a time when defendant "had already begun to drive away," thereby constituting a seizure of the defendant, and State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993), which concluded that the officer had seized the defendant when the officer "turned on his blue lights to stop the defendant" when the defendant's car "beg[a]n to move").

Therefore, applying these legal principles to the instant case, we must decide whether Deputy Yoakum seized Crepack prior to discovering evidence of his impairment. After objectively viewing all the circumstances in this case, we conclude that Deputy Yoakum's actions in parking beside Crepack's vehicle and exiting his patrol car did not constitute a "seizure" for the purposes of the Fourth Amendment. The proof shows that Deputy Yoakum's initial encounter with Crepack was not accompanied by physical force or a show of authority. Deputy Yoakum never drew a weapon, demanded the production of identification, physically restrained Crepack, or blocked his path. See Daniel, 12 S.W.3d at 427. However, in our view, when Deputy Yoakum told Crepack to stop after Crepack began backing out of his parking space, Deputy Yoakum seized Crepack. In reaching this conclusion, we place particular emphasis on the fact that Crepack's vehicle was in motion when Deputy Yoakum told him to stop. See id. at 426 n.6. Consequently, we conclude that a seizure for the purposes of the Fourth Amendment and article I, section 7 occurred when Deputy Yoakum told Crepack to stop as he was backing out of his parking space at the New Center Market.

Because we have concluded that a seizure occurred, we must now determine whether Deputy Yoakum's conduct was justified by reasonable suspicion, probable cause, or some other exception to the warrant requirement. One exception to the warrant requirement allows for a brief investigatory stop of a vehicle that is supported by reasonable suspicion. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). "When an officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be committed, a detention is warranted." Williamson, 368 S.W.3d at 474 (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). Reasonable suspicion is determined by considering the totality of the circumstances surrounding the stop. State v. Davis, 484 S.W.3d 138, 150 (Tenn. 2016); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). Such circumstances include "an officer's observations; information from other law enforcement personnel or agencies; information from citizens; known patterns of criminal offenders; or deductions based upon experience." Williamson, 368 S.W.3d at 474 (citing State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)). When considering the reasonableness of an officer's actions, "the nature of the crime suspected may be a factor." Id. (citing State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998)). Whether reasonable suspicion exists to validate a

stop is a mixed question of fact and law. <u>Davis</u>, 354 S.W.3d at 726 (quoting <u>State v. Garcia</u>, 123 S.W.3d 335, 342 (Tenn. 2003)).

Reasonable suspicion must be supported by more than an officer's "inchoate and unparticularized suspicion or 'hunch.'" <u>Day</u>, 263 S.W.3d at 902 (quoting <u>Terry</u>, 392 U.S. at 27). However, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause [and] can arise from information that is less reliable than that required to show probable cause.'" <u>State v. Hanning</u>, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting <u>Day</u>, 263 S.W.3d at 903). When determining the reasonableness of a stop, we must consider the following factors: "'(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.'" <u>Id.</u> at 53 (quoting <u>State v. Pulley</u>, 863 S.W.2d 29, 34 (Tenn. 1993)).

Here, Crepack insists that Deputy Yoakam's actions constituted a warrantless seizure that was not justified by reasonable suspicion or any other exception to the warrant requirement. Because this case concerns information provided by an anonymous caller, we must next determine whether the anonymous caller's reports, either standing alone or corroborated by other circumstances, provided Deputy Yoakum with reasonable suspicion to justify the seizure of Crepack. <u>See</u> <u>Williamson</u>, 368 S.W.3d at 476.

An anonymous informant's tip may provide the basis, in whole or in part, for an investigatory stop. <u>Navarette v. California</u>, 134 S. Ct. 1683, 1688 (2014). However, whenever an anonymous informant provides information, there is an increased concern as to "whether the information is reliable or whether it was fabricated." <u>Hanning</u>, 296 S.W.3d at 49; <u>see</u> <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." (citation and internal quotation marks omitted)).

When information from an anonymous informant contributes to the stop of a motor vehicle, a totality-of-the-circumstances analysis may be appropriate in determining whether reasonable suspicion or probable cause exists to support the stop. <u>Compare</u> <u>State v. Tuttle</u>, 515 S.W.3d 282, 307-08 (Tenn. 2017) (overruling <u>Jacumin</u> and adopting the <u>Gates</u> totality-of-the-circumstances analysis when determining whether an affidavit establishes probable cause for issuance of a search warrant), <u>and</u> <u>Navarette</u>, 134 S. Ct. at 1687 (holding that reasonable suspicion to justify a stop depends on both "the content of information possessed by police and its degree of reliability" and that this "standard takes into account 'the totality of the circumstances.'" (citations omitted)), <u>with</u> <u>Day</u>, 263 S.W.3d at 903 ("Under circumstances where the information forming the basis for a motor vehicle stop is derived from an anonymous informant, Tennessee law requires

- 10 -

some showing of both the informant's veracity or credibility and his or her basis of knowledge."), and Keith, 978 S.W.2d at 866 (While independent police corroboration can compensate for deficiencies in either prong of this test, "each prong represents an independently important consideration that must be separately considered and satisfied in some way.").

In conducting this totality-of-the-circumstances analysis, an informant's "veracity" and "basis of knowledge" remain highly relevant but should not be recognized as distinct and independent requirements to be rigidly applied in each case. Tuttle, 515 S.W.3d at 303 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)). Circumstances surrounding the informant's tip, such as contemporaneous police corroboration of the tip or corroboration of several details of the informant's report, may increase the reliability of the tip. State v. Simpson, 968 S.W.2d 776, 782 (Tenn. 1998); see Hanning, 296 S.W.3d at 49 (citing State v. Wilhoit, 962 S.W.2d 482, 487 (Tenn. Crim. App. 1997)). Moreover, the content of an anonymous tip is a crucial factor in determining the reasonableness of a stop, particularly, "the level of danger that the tip reveals." Pulley, 863 S.W.2d at 32.

Crepack argues there is nothing in the record that shows the anonymous caller's basis of knowledge. He claims that because "the time between the initial dispatch [of Deputy Yoakum] and his arrival at the market was approximately eighteen minutes," the State has failed to show that Deputy Yoakum was able to verify the details of the call shortly after receiving them for the purpose of establishing the caller's basis of knowledge. See Wilhoit, 962 S.W.2d at 487-88.

When considering the anonymous informant's basis of knowledge in this case, we note that "'[w]hen an informant reports an incident at or near the time of its occurrence, a court can often assume that the report is first-hand, and hence reliable.'" Hanning, 296 S.W.3d at 49-50 (quoting Pulley, 863 S.W.2d at 32); see Navarette, 134 S. Ct. at 1689 ("By reporting that she had been run off the road by a specific vehicle—a silver Ford F-150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving," thereby establishing a basis of knowledge and lending substantial support to the tip's reliability.). Moreover, "contemporaneity of the caller's observation and the call, coupled with an officer's verification of details of the caller's observations shortly after receiving the call, can be sufficient to satisfy the basis of knowledge prong of our inquiry." Hanning, 296 S.W.3d at 50 (citing Wilhoit, 962 S.W.2d at 487-88).

In Crepack's case, the anonymous caller stated that a reckless, possibly impaired motorist was driving a "red or burgundy Chevy Lumina" on Newport Highway. The caller also provided a tag number and gave a physical description of the driver of the suspect's vehicle. Moments later, the same caller telephoned dispatch a second time to

notify law enforcement that the suspect's vehicle had pulled into the New Center Market. The specific details regarding the vehicle and its driver, as well as the ongoing, contemporaneous reports as to the suspect's whereabouts, suggested that the caller was "reporting the reckless driving as it occurred." See id. Because the substance of both phone calls indicated that the caller had eyewitness knowledge of Crepack's reckless driving, we acknowledge that the caller's reports automatically possessed a certain degree of reliability. See id.; Navarette, 134 S. Ct. at 1689. We also recognize that Deputy Yoakum's confirmation, within minutes, of several details from the anonymous caller's first-hand reports "was sufficient to demonstrate the caller's basis of knowledge." Hanning, 296 S.W.3d at 50.

When considering anonymous caller's credibility, we acknowledge that Deputy Yoakum's independent corroboration of numerous details provided by the caller, specifically the color, make, and model of the suspect's vehicle, the physical description of the driver, and the location of this vehicle at New Center Market off of Newport Highway within minutes of the reports, provided at least some justification for believing that the anonymous caller was credible. Id.; Bishop, 431 S.W.3d at 38; Navarette, 134 S. Ct. at 1689 (noting that because police confirmed the truck's location within 18 minutes of the 9-1-1 call, the "timeline of events suggest[ed] that the caller reported the incident soon after she was run off the road," which made the report "especially reliable."). We also find the following reasoning in Hanning persuasive:

> [I]n order to use the police for harassment by falsely reporting that an individual is driving recklessly, the tipster would be required to know not only that the person he seeks to harass is driving a particular vehicle at a specific time and location, but also that at the time the report is made, an officer will be in close enough proximity to the subject to promptly execute a stop of the vehicle. Given the intricacies and improbabilities that would be involved in seeking to harass another by a report of reckless or erratic driving, it seems highly unlikely that such a report will have been fabricated for that purpose.

Hanning, 296 S.W.3d at 51; see Bloomingdale v. State, 842 A.2d 1212, 1220 (Del. 2004) (concluding that because reporting erratic driving "is such an intricate, improbable, and imprecise method of harassing another, the risk that an anonymous tip of erratic driving has been submitted by a malicious, false informant becomes significantly reduced"). We also recognize that because the anonymous caller in this case called two different times to inform law enforcement of Crepack's reckless driving and location, this also supports the caller's credibility.

Finally, we note that Crepack's backing his car out of the parking space, when viewed along with the substance of the anonymous caller's reports and the contemporaneous identification of the vehicle from the caller's description, was a "sufficiently unusual circumstance" to arouse the officer's suspicion that Crepack was engaged in criminal activity. Hanning, 296 S.W.3d at 50; see Hanning, 296 S.W.3d at 56 (Wade, J., concurring) (concluding that "the content of the tip, the identification of the vehicle from the description provided, and the single observation by the officer as to the location of the truck[, which was parked in an unusual location,]" was sufficient to establish, "by a bare margin[,]" reasonable suspicion justifying the stop) (noting that "'even conduct which is wholly lawful . . . may form the basis for a reasonable suspicion that criminal activity is afoot,' especially when combined with an informant's tip" (quoting State v. Welch, 873 P.2d 601, 604 (Wyo. 1994)).

In arguing that his stop was not justified, Crepack seeks to distinguish the facts of his case from those in State v. Hanning. In Hanning, id. at 46, an anonymous caller reported that a northbound black "18-wheeler" with "1-800-GoSmith" or "Go Smith Brothers" on the back was being driven recklessly and had just taken the Highway 72 exit ramp from Interstate 75. Radio dispatch broadcasted this information, and shortly thereafter, an officer identified a truck matching this description parked in the emergency lane of the Highway 72 exit ramp. Id. The officer activated his emergency blue lights, drove his patrol car down the ramp against the flow of vehicles, and parked with the front of his patrol car close to the front of the truck. Id. at 46-47. The officer then approached the truck's door, which had the words "Smith" and "transport" affixed, and asked the truck's driver to step out of the truck. Id. When the driver complied, the officer asked him if he had been drinking and administered field sobriety tests before arresting him for DUI and transporting him to a hospital for a blood alcohol test. Id. In determining whether reasonable suspicion existed for this stop, the court held that while parking a truck in the emergency lane of the exit ramp was not a statutory offense at that time, "it was a sufficiently unusual circumstance to arouse [the officer's] suspicion that the truck was the one reported by the caller as having been driven recklessly." Id. at 50.

Crepack argues that unlike in Hanning, where the tractor trailer truck was parked in the emergency lane of an exit ramp, there was "nothing so unusual about a burgundy car parked outside a convenience store" that would "arouse suspicion of illicit activity" in his case. However, in applying the Hanning factors for determining the reasonableness of a stop, we acknowledge that Deputy Yoakum's detention of Crepack served the public interest in preventing reckless or impaired driving, conduct which presents "a high degree of danger." Hanning, 296 S.W.3d at 53. In addition, the nature and scope of Deputy Yoakum's detention of Crepack, which took a matter of seconds, was minor and involved no physical contact. See id. As previously acknowledged, while this is a close case, under the totality of the circumstances, we conclude that the warrantless seizure of

Crepack at the moment Deputy Yoakum told him to "stop" was justified, albeit barely, by reasonable suspicion of criminal activity. Accordingly, we conclude that the trial court did not err in denying Crepack's motion to suppress.

**II. Sentencing.** Crepack also argues that the trial court erred in sentencing him to eleven months and twenty-nine days to be served at 100% for his DUI, third offense. He claims that the trial court's decision to order him to serve his entire sentence in confinement is inconsistent with the purposes and principles of the sentencing act. The State counters that a sentence of eleven months and twenty-nine days at 100% is a permissible sentence for DUI, third offense, and that Crepack's sentence is reasonable given his criminal history and his blood alcohol level in this case. We agree with the State.

Although Crepack failed to include the transcript for the motion for new trial in the appellate record, we reiterate our belief that the record is adequate for our review. See Caudle, 388 S.W.3d at 277. Therefore, waiver notwithstanding, we will address this sentencing issue on its merits.

In Bise, the Tennessee Supreme Court concluded that a trial court's sentencing determinations in felony cases should be reviewed under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also governs "questions related to probation or any other alternative sentence." Caudle, 388 S.W.3d at 278-79. To date, the Tennessee Supreme Court has not addressed whether the abuse of discretion standard with a presumption of reasonableness applies to misdemeanor sentencing. Nevertheless, the reasoning espoused in King, namely that Bise applies to "all sentencing decisions," suggests that it is the appropriate standard of review to apply to misdemeanor sentencing cases as well. State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (citing State v. Pollard, 432 S.W.3d 851, 864 (Tenn. 2013)); see State v. Bobby E. Lee, No. M2016-02084-CCA-R3-CD, 2017 WL 1806825, at *2 (Tenn. Crim. App. May 5, 2017); State v. Clifford Eric Marsh, No. M2015-00803-CCA-R3-CD, 2016 WL 349928, at *3 (Tenn. Crim. App. Jan. 28, 2016); State v. Christopher Dewayne Henson, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *5 (Tenn. Crim. App. June 2, 2015), perm. app. denied (Tenn. Sept. 17, 2015); State v. Sue Ann Christopher, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013), perm. app. denied (Tenn. June 18, 2013). Therefore, we will apply the Bise standard of review in this case.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following factors when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1)     The evidence, if any, received at the trial and the sentencing hearing;
(2)     The presentence report;
(3)     The principles of sentencing and arguments as to sentencing alternatives;
(4)     The nature and characteristics of the criminal conduct involved;
(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7)     Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b).  The defendant has the burden of showing the impropriety of the sentence on appeal.  Id. § 40-35-401(d), Sentencing Comm'n Cmts.  The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[,]" id. § 40-35-102(1), but must consider the defendant's potential for rehabilitation or treatment, id. §§ 40-35-102,-103.  In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Id. §§ 40-35-103(2), (4).

Here, Crepack was convicted of DUI, third offense, a Class A misdemeanor.  Id. §§ 55-10-401, -402(a)(3)(A).  Any person convicted of this offense shall be "sentenced to serve in the county jail or workhouse not less than one hundred twenty (120) consecutive days nor more than eleven (11) months and twenty-nine (29) days."  Id. § 55-10-402(a)(3)(A).  Accordingly, we recognize that Crepack's sentence of eleven months and twenty-nine days at 100% is a permissible sentence for his conviction offense.  State v. Palmer, 902 S.W.2d 391, 393-94 (Tenn. 1995).

Sentences for misdemeanor offenses must be specific and in accordance with the principles, purposes, and goals of the Criminal Sentencing Reform Act of 1989.  Id. §§ 40-35-104, -302(b); State v. Cooper, 336 S.W.3d 522, 524 (Tenn. 2011); Palmer, 902 S.W.2d at 394.  The sentencing court is granted considerable latitude in misdemeanor sentencing.  State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)).  While a separate sentencing hearing is not required in misdemeanor cases, the court must provide the defendant with a reasonable opportunity to be heard as to the length and manner of the sentence.  T.C.A. §

- 15 -

40-35-302(a). An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence. Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)).

Crepack, while conceding that the sentence he received is permissible, nevertheless contends that the trial court erred in ordering him to serve his entire sentence in confinement. He admits that he had prior DUI convictions and some other driving violations on his record. However, he asserts that he had no felony convictions, was gainfully employed, and was acting as the primary caregiver for his mother and that despite the existence of these mitigating factors, the trial court relied only on his criminal history in enhancing his sentence to more than twice the presumptive minimum sentence of 120 consecutive days in confinement. See T.C.A. § 55-10-402(a)(3)(A). As to this claim, we note that a trial court is guided by, but not bound by, any applicable enhancement or mitigating factors when imposing a sentence, and we will not disturb a trial court's sentence unless the court wholly departed from the purposes and principles of the Sentencing Act. See Bise, 380 S.W.3d at 706. We do not find this to be the case here.

Crepack also insists that serving an entire sentence in confinement is only appropriate "where the driving record of the defendant [is] so lengthy as to show a complete disregard for the laws that govern the roadways" or "in cases where a defendant had a number of D.U.I.s in a short span of time, giving rise to the idea that the defendant has a significant alcohol problem." The record shows that Crepack had four prior DUI convictions at the time of sentencing and that his license had been revoked for a prior DUI at the time he committed the DUI in this case, which we believe indicates a total disregard for the laws governing roadways. At the sentencing hearing, Crepack denied that he had been drinking and driving the day of his arrest, despite the fact that he had an open container of beer in his vehicle and that his blood alcohol level was 0.179%. Given this proof, we find Crepack's arguments unpersuasive.

At the conclusion of the sentencing hearing, the trial court found that Crepack's blood alcohol level and his extensive criminal history supported the imposition of a sentence of eleven months and twenty-nine days at 100% for his DUI, third offense, conviction, and the record fully supports these findings. Crepack's sentence was a permissible sentence for his conviction offense and reflects the court's consideration of the purposes and principles of the sentencing act. Accordingly, we conclude that the trial court did not abuse its discretion in ordering Crepack to serve his entire sentence of eleven months and twenty-nine days in confinement. See id. at 707.

As a final note, we detect some clerical errors in the judgment forms that require correction. Here, the trial court merged Count 2 with Count 1. A complete judgment form for each count of the indictment is required by law. See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order for publication summarily granting the application of the defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("[W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count."). This rule ensures that there is a complete record of each conviction and sentence in the event that one of the convictions is later reversed. Therefore, we remand this case to the trial court for entry of corrected judgment forms for Count 1 and Count 2. On remand, the trial court should impose separate sentences for Count 1 and Count 2 and should place these sentences on each judgment form. Id. Next, the trial court should note in the "Special Conditions" box on Count 1, which is the greater or surviving conviction, that the conviction in Count 2 merges with the conviction in Count 1. This merger should also be noted in the "Special Conditions" box for Count 2. Id.

## CONCLUSION

We conclude that Crepack's warrantless seizure was supported by reasonable suspicion of criminal activity and that the trial court did not abuse its discretion in sentencing him to the maximum sentence for DUI, third offense. We remand the case for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion, but in all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE