IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

July 8, 2025 Session

**STATE OF TENNESSEE v. RICKY LEE ALLEN, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 22-158   Joseph T. Howell, Judge**

———————————————————

**No. W2024-00333-CCA-R3-CD**

———————————————————

Defendant, Ricky Lee Allen, Jr., was convicted by a jury of driving under the influence ("DUI"). Defendant claims that the trial court erred by failing to suppress the evidence obtained as a result of his traffic stop, which he argues was unreasonably long, and that the trial court erred by finding that defense counsel "opened the door" to evidence that Defendant refused consent to have a blood sample taken. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

C. Mark Donahoe (at trial and on appeal) and Drew Farmer (on appeal), Jackson, Tennessee, for the appellant, Ricky Lee Allen, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Allison P. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
*I.*
*II.     Factual and Procedural Background*

This case arises from a September 16, 2021 traffic stop of Defendant, who at the time was an off-duty officer with the Jackson Police Department ("JPD"). The evidence at the suppression hearing and trial reflected that, around 11:10 p.m., JPD Officer Paul

Hugueley[1] observed a truck driving with its headlights turned off and failing to maintain its lane. After following the truck for about two minutes, Officer Hugueley stopped Defendant at 11:12 p.m., upon which Defendant provided him with his JPD identification card instead of his driver's license. Officer Hugueley contacted fellow JPD Officer Josh Michael, who called their supervisor, Sergeant Lance Wright. Sergeant Wright, in turn, called the shift supervisor, Lieutenant Steven Story. Officer Michael, Sergeant Wright, Lieutenant Story, and Sergeant Chris King responded to the scene.

After speaking to the police chief, Lieutenant Story requested that a Tennessee Highway Patrol ("THP") trooper come to the scene for an "unbiased observation" of Defendant. Trooper Jalita Fason arrived at the scene at 12:05 a.m., and she conducted field sobriety tests ("FSTs") at 12:38 a.m. Based upon Defendant's performance on the FSTs, Trooper Fason arrested him at 1:01 a.m. Defendant was subsequently indicted by the Madison County Grand Jury for DUI and violation of the implied consent law.[2] *See* Tenn. Code Ann. §§ 55-10-401, -406.

### A. Motion to suppress proceedings

Defendant filed two pretrial motions "to exclude testimony" and "to exclude testimony and dismiss" (collectively the "motion to suppress"), in which he argued that the evidence obtained as a result of the traffic stop should be suppressed because the stop was prolonged such that it became a constitutionally unreasonable seizure. The parties agree that the traffic stop was one hour, twenty-six minutes in length.

The State responded that the facts of the case were "unprecedented" and argued that the delay was necessary to avoid the "appearance of bias or favoritism" in light of the conflict of interest arising from the JPD officers' relationships with Defendant. The State asserted that the delay was caused solely by the time it took (1) for the JPD to determine how to investigate an alleged crime committed by a JPD officer; (2) to request assistance from THP; and (3) for Trooper Fason to arrive at the scene and conduct an independent investigation. The State noted, "It is uncontested that [D]efendant was detained and not free to leave from the time his vehicle was stopped at 11:12 p.m., and when he was placed under arrest by Trooper Fason at approximately 1:01 a.m."

The State argued that the JPD officers "diligently pursued a means of investigation"; that they did not "expand the scope of the investigation, divert from the stop's original purpose, or prolong the stop to investigate other crimes"; that the stop was not prolonged

---

[1] In the suppression hearing transcript and exhibits, Officer Hugueley's surname is spelled "Hugley," "Hugueley," and "Huguely." The technical record and trial transcript reflect that the correct spelling is Hugueley.

[2] The State later declined to prosecute Count 2, violation of the implied consent law.

in order to gather additional evidence; and that communication with leadership was complicated by the late hour. The State further argued that the delay was "a de minimis intrusion on [D]efendant's constitutional rights," stating:

> [D]efendant was not placed in handcuffs, nor was he detained in a patrol vehicle — he was simply asked to step out of his vehicle and searched for weapons. The facts will show that once Trooper [] Fason arrived on the scene, the delay in beginning [FSTs] was to allow [D]efendant to finish speaking with his supervisor Lt. [] Story. In any case involving intoxication due to alcohol, delay in conducting [FSTs] benefits the defendant, not the State. [D]efendant, who conducted DUI investigations in his official capacity as a [JPD] officer, would be aware of this.

The general timeline of events, which was not disputed by either party, was as follows:

| Time | Event |
|---|---|
| 11:12 p.m. | Officer Hugueley activates his blue lights and stops Defendant |
| 11:13-11:15 p.m. | Officer Hugueley's initial conversation with Defendant |
| 11:18 p.m.[3] | Officer Michael arrives at the scene and calls Sergeant Wright |
| 11:27 p.m. | Officer Hugueley speaks to Sergeant Wright with Officer Michael |
| 11:29 p.m. | Officers Hugueley and Michael have Defendant exit his truck; Sergeant Wright speaks to Defendant; Defendant refuses FSTs |
| 11:32 p.m. | Lieutenant Story and Sergeant King arrive at the scene |
| 11:38 p.m. | Officer Hugueley pats down Defendant |
| 12:05 a.m. | Trooper Fason arrives on scene |
| 12:17 a.m. | Sergeant King tells Lieutenant Story that Defendant has asked to speak with him |

---

[3] Although Officer Michael's dashboard camera had no time stamp and his body camera was not turned on until later, we calculated his arrival time by comparing the events in the dashboard recording with other exhibits containing a time stamp.

| 12:18-12:37 a.m. | Lieutenant Story speaks to Defendant |
|---|---|
| 12:38 a.m.-12:47 a.m. | Defendant completes FSTs |
| 12:47 a.m. | Trooper Fason discusses with Lieutenant Story, Sergeant Wright, and Officer Hugueley the reason for the traffic stop |
| 12:55 a.m. | Trooper Fason and Lieutenant Story discuss that she will arrest Defendant |
| 1:01 a.m. | Trooper Fason arrests Defendant and handcuffs him |

###### i.    *Video exhibits*

At the suppression hearing, the trial court noted for the record that it had reviewed several recordings in advance of the hearing. The suppression hearing exhibits consisted of Officer Hugueley's dashboard and body cameras; Officer Michael's dashboard and body cameras; and Trooper Fason's dashboard and backseat cameras.

Officer Hugueley's dashboard camera did not contain audio, and his body camera recording began when he was mid-conversation with Sergeant Wright at 11:27 p.m.; accordingly, Officer Hugueley's initial conversation with Defendant and any discussion between Officer Hugueley and Officer Michael before Sergeant Wright arrived were not documented. Sergeant Wright's arrival time was also not documented. Officer Michael's dashboard camera did not have a time stamp, and his body camera recording began at 11:36 p.m.

Officer Hugueley's dashboard camera recording began as Officer Huguley was accelerating on a straight stretch of road to catch up to Defendant's truck. Defendant was driving in the left lane on a four-lane divided road, on which other motorists were driving in both directions. Defendant drifted on top of the yellow line twice, and on one of those occasions went slightly left of center. At a curve in the road preceding an intersection, Defendant traveled over an area marked with diagonal stripes leading to a left turn lane before he corrected and went straight through the intersection. After the intersection, Defendant drove straight through a slight curve in the road, which resulted in his passing into the right-most lane without using a turn signal. Defendant drove on top of the fog line very close to a curb in front of a gas station before activating his right turn signal and performing a rolling stop at a red light. The road onto which Defendant turned was a two-lane road. After turning, Defendant drifted to the right beyond the fog line over an area with gravel at a small intersection. Defendant drove on top of the center line and drifted right back into his lane. When Defendant again began to drift slightly left of the center line, Officer Hugueley activated his blue lights, and Defendant pulled over. Officer

Hugueley walked to the truck's front passenger-side window, spoke to Defendant, took something from him, and walked back to his police cruiser.

In Officer Hugueley's body camera recording, he told Sergeant Wright that he had seen Defendant's police jacket in the truck and that he felt that something was "not right." Officer Hugueley said that he had asked Defendant if he could make it home, to which Defendant replied that he "definitely" could. Officer Hugueley denied smelling anything on Defendant. Sergeant Wright asked Officer Hugueley to bring Defendant to him.

Officers Michael and Hugueley asked Defendant to step out of his truck, and Defendant appeared to walk normally, although he favored his left foot slightly. Officer Hugueley stood near the front of his police cruiser, and Defendant stood beside it. Between the time he exited the truck and when he began FSTs, Defendant leaned on the police cruiser with one hand or his backside; he occasionally stood with his hands in his pockets or arms crossed.

Sergeants Wright and King and Lieutenant Story engaged Defendant in conversation for most of the time before Trooper Fason arrived, with a few exceptions—although Defendant was supervised by an officer at all times, he stood by the police cruiser without speaking to anyone from 11:35-11:43 p.m., 11:44-11:47 p.m., and 11:54 p.m.-12:05 a.m. Almost all the conversations between Defendant and the officers at the scene were inaudible.

Although it was not captured by any of the cameras, the parties agreed that Sergeant Wright asked Defendant to perform FSTs, and Defendant refused. When they were not talking to Defendant, Sergeant Wright and Lieutenant Story were visible speaking to one another and, on separate occasions, sitting in Officer Hugueley's police cruiser trying to watch the dashboard recording of Defendant's driving.

The only conversation in which more than a word or two was audible occurred at 12:08 a.m., when Defendant told Sergeant Wright that he loved him; Sergeant Wright responded, "I love you too Ricky." Sergeant Wright continued, "[Y]ou can be mad at me right now . . . . But as long as it's taken us to be out here, that should show you that we're trying to do the best we can to do right by you, and right by everybody involved." Sergeant Wright reiterated that he loved Defendant no matter what happened and that he was trying to help. Sergeant Wright also remarked that questions he had asked about Defendant's family were unrelated to his police duties.

Sergeant Wright also discussed with Officer Hugueley that he used to play golf regularly with Defendant and that he did not "like this" any more than Officer Hugueley did. As the stop progressed and Trooper Fason arrived, Officer Hugueley became upset by the prospect that Defendant might be arrested. Sergeants Wright and King and Lieutenant

Story all told Officer Hugueley that he should not feel bad for doing his job. Sergeant Wright discussed that Defendant could have killed someone on the road. Lieutenant Story also speculated that issues Defendant was having at home likely explained why he was drinking so much. At 12:12 a.m., Lieutenant Story asked Officer Hugueley, "You've already stopped [Defendant] once?" Officer Hugueley responded negatively, and Officer Michael interjected that he thought Sergeant Wright might have done so.

Trooper Fason's dashboard camera recording included audio from the car as well as Trooper Fason's body microphone, but there was a large amount of static on the recording when her microphone was turned on. Trooper Fason arrived at 12:05 a.m. and spoke to Lieutenant Story, then Sergeant Wright. Their conversations were not recorded. Trooper Fason spoke to someone on the phone briefly, then talked to the other officers again before moving her police cruiser into position for the FSTs. Trooper Fason stood outside and waited for Defendant beginning at 12:18 a.m. At 12:17 a.m., Sergeant King walked up to Lieutenant Story and said, "He wants to talk to you real quick." Lieutenant Story and Defendant spoke until 12:38 a.m., when Trooper Fason began the FSTs.

Officer Hugueley, meanwhile, had crossed the street, and he spoke with Sergeant Wright again about Sergeant Wright's friendship with Defendant and the possibility that Defendant was having personal problems. Sergeant Wright told him that the police chief wanted THP to do an "unbiased observation" and give an opinion of Defendant's condition and whether THP would arrest him if they had made the stop.

Officer Hugueley called someone as he watched Defendant and Trooper Fason from across the street. Officer Hugueley remarked, "He's bad drunk dude. He just told [Sergeant] Wright to go away. He walks good, but he hasn't really moved." As Defendant walked to begin the FSTs, Officer Hugueley stated, "Aw, he can't walk dude. Oh man, he is— Oh, God. Aw dude, he can't stand up . . . . He's drunk." Officer Hugueley commented, "I thought he walked good [when he exited the truck]." Sergeant Wright then waved Officer Hugueley over and asked him to record the FSTs with his body camera.

At 12:38 a.m., Trooper Fason performed a "horizontal gaze nystagmus" test. At 12:40 a.m., Trooper Fason began instructing Defendant on the "walk-and-turn" test. Defendant shifted his weight and lost his balance while standing. During the test, he stumbled going both directions, and he had to reset his feet several times before resuming walking. During the "one leg stand" test at 12:42 a.m., Defendant lifted his right foot into the air, repeatedly tilted and hopped after losing his balance, extended his arms, and was generally unable to keep his foot raised. An additional test involved Defendant's closing his eyes, tilting his head backward, and counting silently for thirty seconds; Defendant kept his eyes closed for seventy-four seconds. The final test was reciting the alphabet in order; Defendant stopped at C, then started again and stopped at P, and then stopped at C again before the test ended.

After finishing the FSTs, Trooper Fason addressed Officer Hugueley and asked if the reason for the stop was failure to maintain lane. Lieutenant Story interjected and answered affirmatively, commenting that the truck was "all over the place." At 12:51 a.m., Trooper Fason called the THP sergeant on duty and told him that Defendant was "trashed" and had failed the FSTs "tremendously." She confirmed that she could arrest Defendant and "transfer" probable cause through Officer Hugueley. Trooper Fason noted that she had told JPD that, if they did not arrest Defendant, she would. Trooper Fason collected Defendant's driver's license from him and handcuffed him at 1:01 a.m. After issuing *Miranda* warnings, Trooper Fason had Defendant sign an implied consent form; the exchange was not intelligible over the static in this portion of the recording.

On multiple occasions during the stop, Officer Hugueley questioned whether Defendant should have to go to jail, stating that what he needed was help. Officer Hugueley noted that although people had told him that Defendant could have killed someone, Defendant could also have made it home safely. Officer Hugueley stated that he felt bad about the situation. Lieutenant Story responded that he should notify him immediately if anyone said a "cross word" to him.

After Defendant's arrest, Officer Hugueley assisted Lieutenant Story to briefly search Defendant's truck for any JPD-owned firearms. The video showed one pistol in the center console, which they examined and returned. A glass bottle neck was visible inside a bag in the backseat. Officer Hugueley walked over to Defendant, who was leaning against the front of Trooper Fason's police cruiser in handcuffs, and asked what he wanted done with the firearms inside the truck. Defendant asked Officer Hugueley why he went into his truck, and Officer Hugueley asked if Defendant wanted them to leave the firearms or take them for safekeeping. Defendant responded that he wanted his truck towed to his house. Defendant's speech was slightly slurred. Defendant asked for Officer Hugueley's name and stated flatly, "Good job, buddy."

Officer Hugueley returned to his police cruiser and began crying; as Sergeant Wright consoled him, he stated that Defendant was having trouble at home and would "keep doing this[.]" Sergeant Wright indicated that he and Defendant had been very close friends when they worked on the same shift and that the situation was difficult for him as well. Officer Hugueley stated to Sergeant Wright, "I have been here before. I know how this is going to turn out. I'll be the black sheep now, and . . . this is not right." Sergeant Wright responded, "[Defendant] is sloppy f--king drunk, Paul," and he remarked that they could only help a person who wanted to be helped. Lieutenant Story and Sergeant Wright discussed that they might not need to issue a citation to Defendant for failure to maintain lane, and Officer Hugueley emphatically stated that he did not want to issue a citation.

Trooper Fason's backseat camera reflected that Defendant spoke on the phone with a woman while he was transported to jail. Before Trooper Fason drove away from the

scene, Defendant addressed Sergeant Wright and stated that it was good to see him; Sergeant Wright told Defendant again that he loved him.

ii.     *Suppression hearing testimony*

At the suppression hearing, Officer Hugueley testified that, on September 16, 2021, at about 11:08 p.m., he was working an overnight patrol shift when he saw a truck without its headlights illuminated[4] come through a roundabout and "veer[] over into the southbound lane." Officer Hugueley stated that he turned on his dashboard camera and followed the truck before activating his blue lights on Campbell Street near a Dollar General store.

When asked what additional driving behavior he noted after Defendant's truck exited the roundabout, Officer Hugueley stated,

> That vehicle crossed the lane of traffic, failure to maintain the lane more than once . . . . Somewhere down there in the curve past Forest, the vehicle struggled to make -- I thought the vehicle was going into the parking lot. And then on Campbell Street, the vehicle turned and went east and actually kicked up a cloud of dust from running off the road right around the Dollar General area there. So it was multiple violations that led me to believe that that driver was intoxicated.

Officer Hugueley testified that, as he walked toward the truck, he heard "what appeared to be the console of the vehicle close" and walked to the front passenger-side window for safety. He said that Defendant handed him his JPD identification, at which point Officer Hugueley "started calling for help." Officer Hugueley noted that he was familiar with Defendant's name but had never met him. Officer Hugueley added that he recalled Defendant's being "real talkative" during their interaction and that Defendant "even wanted to like kind of face forward, just didn't seem normal." Officer Hugueley told Defendant to sit in his vehicle and that he would return shortly.

Officer Hugueley testified that he called Officer Michael, whom he had seen parked nearby, and informed him that he had pulled over Defendant and that he believed Defendant was intoxicated. Officer Hugueley stated that he "had no idea what to do."

Officer Hugueley testified that, at some point later, Sergeant Wright arrived and asked them to have Defendant step out of the truck. Officer Hugueley stated that Sergeant King and Lieutenant Story were also at the scene. Officer Hugueley said that he saw

---

[4] We note that, by the time Officer Hugueley began recording the incident with his dashboard camera, the truck appeared to have its headlights turned on; however, the recording began after Officer Hugueley began following Defendant and does not include Defendant's driving through a roundabout.

Lieutenant Story's talking on the phone "trying to figure out who to call or where to call." Officer Hugueley stated that a THP trooper ultimately conducted the DUI investigation.

Officer Hugueley testified that he remained on scene and had "[v]ery minor" interactions with Defendant. Officer Hugueley noted that two or three firearms were found in Defendant's truck and that he had asked Defendant what he wanted to do with them. Officer Hugueley testified that he had not participated in any other DUI investigations involving a JPD officer.

On cross-examination, Officer Hugueley testified that, when he activated his blue lights, his purpose was to investigate a DUI and that Defendant was not free to leave at that point. Officer Hugueley stated that he did not know Trooper Fason was coming to the scene until she arrived.

Officer Hugueley testified that he began working as a police officer with the Huntingdon Police Department in 2015; he later transferred to the JPD. He agreed that he had completed "POST training," which included DUI investigations, and that he had made "a few" DUI arrests in his career. Officer Hugueley agreed that he was capable of administering FSTs and that they assisted him in making a probable cause determination. He further agreed that FSTs were "not always conclusive" as to whether a person was intoxicated and that external factors could influence their results, such as a person's medications, having certain health conditions, or being "excessively fatigued." Officer Hugueley denied that he had ever arrested someone for DUI "and the blood test came back under the limit[.]" Officer Hugueley stated that he had previously determined that a person was not intoxicated based upon their performance on FSTs. Officer Hugueley agreed that he had discretion when deciding whether a person was under the influence. He denied that he had ever been told that he failed to arrest a person when he should have done so.

Officer Hugueley did not recall whether he issued Defendant a traffic citation. Officer Hugueley did not remember if he asked Defendant for his driver's license or ran Defendant's license plate number, although he knew he did not do so before the traffic stop. Officer Hugueley stated that, after he found out who Defendant was, his intent "was to get some help from somebody who had been a little more up-to-date with what JPD does in this situation." Officer Hugueley agreed that Defendant was allowed to remain unattended in his vehicle for sixteen minutes.

Officer Hugueley testified that, in normal DUI investigations, he would have requested another unit to assist him, then conducted FSTs. He declined to give an average time that administering FSTs would take; he agreed that eight minutes would be "reasonable." Officer Hugueley did not think FSTs ever lasted one hour. Officer Hugueley acknowledged that he did not contact a supervisor directly and only contacted Officer Michael. He agreed that Defendant was not permitted to reenter the truck after he left it.

Officer Hughley agreed that the only reason Defendant was treated differently was because he was employed by JPD. Officer Hugueley agreed that he and Defendant were of the same rank, that they did not work together, and that Defendant could not affect Officer Hugueley's employment, pay, or schedule. Officer Hugueley testified that, although his JPD training indicated that he was not supposed to treat anyone differently, he "just wanted to make sure that [he] was doing what [he] was supposed to" procedurally. Officer Hugueley noted that he had read "[s]ome of" the JPD policy manual but that it changed often and that he had not reviewed it since Defendant's arrest. Officer Hugueley noted, "There could be some . . . . [c]onflict of interest type situation possibly." Officer Hugueley denied that anyone had suggested the term "conflict of interest" to him and maintained that he thought of it. He acknowledged that he did not include the term in his police report. Officer Hugueley was unsure whether JPD policy referenced conflicts of interest involving other officers. Officer Hugueley acknowledged that JPD had previously investigated its own officers, although he noted that a patrol officer would not have conducted those investigations.

Officer Hugueley testified that Sergeant King was his supervisor "for that rotation" and that Lieutenant Story was his "shift commander" and the highest-ranking officer on scene. He agreed that Lieutenant Story was a DUI instructor and that Defendant did not work on Lieutenant Story's shift.

Officer Hugueley did not know whether JPD's policy in DUI cases was to have the driver's vehicle impounded. He stated, though, that he was trained to have vehicles moved to prevent safety hazards. Officer Hugueley said that Defendant's truck was not towed and that another officer drove it to Defendant's house. Officer Hugueley said that Defendant's stop was the longest DUI stop he had experienced.

When asked whether he intended for "some investigation to be conducted" after he initially returned to his police cruiser, Officer Hugueley testified that he could not remember his "exact intent[]" after identifying Defendant as the driver. He stated, though, that he was not going to allow Defendant to drive away. Officer Hugueley did not know what he would have done if Officer Michael had instructed him to investigate or if Defendant attempted to leave on foot.

Sergeant Wright testified that, around 11:20 p.m. or 11:30 p.m.[5] on September 16, 2021, Officer Michael called him and informed him of Defendant's having been stopped. Sergeant Wright immediately called Lieutenant Story and left the police station. Sergeant Wright testified that Officers Hugueley and Michael briefed him when he arrived and that he asked them to have Defendant step out of the truck. Sergeant Wright stated that he

---

[5] Officer Hugueley's body camera recording reflects that Sergeant Wright was on scene by 11:27 p.m.

spoke with Defendant and asked him how much he had to drink that night. Defendant responded that "he had a few" but would not specify how many drinks he consumed. Sergeant Wright asked Defendant to perform FSTs, but Defendant declined. Sergeant Wright said that he could smell alcohol on Defendant's person and that Defendant "didn't physically move around too much" during the conversation.

Sergeant Wright testified that Lieutenant Story arrived at 11:32 p.m. and called "upper command." He said that Lieutenant Story also conversed with Defendant. Sergeant Wright did not make the decision to call THP.

Sergeant Wright stated that he had never pulled over a fellow JPD officer. When asked whether JPD conducted any FSTs in this case, Sergeant Wright responded negatively and reiterated that Defendant had refused to perform them. Sergeant Wright said that THP arrested Defendant and that because Defendant did not have anyone to retrieve his truck, Lieutenant Story and Sergeant Wright decided to drive it to Defendant's home as a courtesy. Sergeant Wright agreed that this was not their standard practice.

Sergeant Wright testified that he had worked for JPD for nineteen years, that he and Defendant briefly worked the same shift, and that they played golf together for two years. He clarified that he and Defendant worked in different areas of the city when they shared a shift.

On cross-examination, Sergeant Wright denied knowing that Defendant was JPD's "top arrest officer"; he noted that he was not given statistics about the department's arrests. Sergeant Wright agreed that he was comfortable with conducting FSTs and that they were important to making a probable cause determination. Sergeant Wright said that Lieutenant Story was present for part of the time Sergeant Wright conversed with Defendant but that Lieutenant Story did not participate. Sergeant Wright stated that he told Lieutenant Story that Defendant had declined to perform FSTs. He said that, after that point, Lieutenant Story was the person who gave orders at the scene.

Sergeant Wright denied that his intent when leaving the police station was "to assist with a DUI investigation." Sergeant Wright stated that, to his belief, no written or unwritten JPD policy existed requiring Officers Hugueley and Michael to call a supervisor if a situation involved another officer. Sergeant Wright affirmed that no JPD policy existed to prevent the department from investigating criminal matters involving its officers or stating that JPD officers were to treat other officers differently than members of the general public in criminal investigations.

Sergeant Wright agreed that he and Officers Hugueley and Michael were able to conduct FSTs and that, had Defendant agreed to them, it would not have been against JPD policy to perform them before Lieutenant Story arrived. Sergeant Wright did not know of

any DUI investigations in which a JPD officer had administered FSTs to another JPD officer. He agreed that a typical set of FSTs could last eight to ten minutes.

Sergeant Wright testified that it was rare for a patrol officer to call supervisors to come to the scene of a DUI investigation. He did not recall whether Defendant asked for his truck to be towed. Sergeant Wright did not recall if anyone was instructed to issue Defendant a citation. Sergeant Wright thought that Officers Hugueley and Michael searched Defendant's truck to locate any JPD-owned firearms. Sergeant Wright agreed that Defendant did not sit down between his exit from the truck and being placed in Trooper Fason's police cruiser. He further agreed that Defendant was not free to leave from the time Sergeant Wright arrived on scene. Sergeant Wright stated that the decision to call in another agency was not his because he was not the highest-ranking officer on the scene. He said that, in previous cases in which people refused FSTs, he did not call in another agency to determine whether to arrest them.

Lieutenant Story testified that, on September 16, 2021, Sergeant Wright called him and reported that Defendant had been stopped for "possible DUI." Lieutenant Story said that, although he had never supervised Defendant directly, he knew Defendant from "training on the track and driving the track" since Defendant started working at JPD. Lieutenant Story noted that he gave all new recruits his phone number during training and told them, "You need help with something, a ride home, whatever, call me. We can make arrangements to get it done."

Lieutenant Story testified that he immediately drove to the scene and arrived in ten to fifteen minutes. He spoke with Sergeant Wright and, a couple minutes later, Defendant; Defendant would only state that he loved his job. Lieutenant Story testified that he contacted the police chief about five minutes later, which was dictated by policy. When asked to describe the policy, Lieutenant Story stated as follows:

> Any time we have an issue that involves an officer, we have to -- as a shift commander, we have to notify our . . . command staff, which I called the chief.
>
> . . . .
>
> . . . . I called the chief to find out exactly how he wanted to handle the situation being it was one of our own officers. We try to take out the bias . . . to correct that[,] so we're not being looked at in a bias situation. The chief suggested either call Madison County or THP and see if they can handle it.

Lieutenant Story stated that he was a DUI instructor and that the police chief instructed him to conduct FSTs if they could not reach an outside agency.

Lieutenant Story testified that he asked police dispatch to contact THP because Defendant worked as a "reserve deputy" with the Madison County Sheriff's Office. Lieutenant Story stated that he explained the situation to Trooper Fason and that she called her supervisor. Lieutenant Story testified that the only crime JPD investigated that night was DUI. He stated that, after Trooper Fason took over, he "stepped back" and supervised scene safety. Lieutenant Story stated that JPD did a "plain-view" search of Defendant's truck for open containers and that they decided to drive Defendant's truck to his house as a courtesy to save him money.

On cross-examination, Lieutenant Story testified that the policy about officers' being involving in criminal incidents was written "under our directives." Lieutenant Story offered to pull up a copy of the regulations on his phone, and he noted that every officer had an electronic copy. He stated that the policy number was "DR 127 which says that you must report any type of illegal activity that occurs." Lieutenant Story noted that there was a "duty to intervene."

When asked whether police officers were treated differently than other citizens, he elaborated, "As part of our policy, an officer is held to a higher standard . . . . Every officer at JPD knows that . . . . It's just our policy, if an officer violates the law, it triggers an internal investigation, which they have to be notified."

Lieutenant Story did not remember telling another officer that Defendant was going to jail, either with Trooper Fason or JPD. Lieutenant Story was Trooper Fason's first contact at the scene, and he said that he told her that they had a "[s]uspicion of DUI." Lieutenant Story agreed that he conducted no testing and that Defendant did not admit to him that he drank alcohol or committed "any other violation." Lieutenant Story testified that, in his experience, correctly performed FSTs should take more than eight to ten minutes and could take thirty to forty minutes on average. He noted that he "kept [him]self away" from Trooper Fason and Defendant while she conducted the FSTs and that he did not know how long they lasted.

Lieutenant Story testified that the police chief did not instruct him how long to wait for THP to arrive. When asked how long he would have waited before conducting FSTs himself, Lieutenant Story responded, "At the point in time that Trooper Fason did show up, it was getting to the point that I was going to do it myself." He agreed that FSTs should be done as soon as possible.

Lieutenant Story testified that he had not heard any complaints about Defendant. He stated that he only kept track of arrest statistics of the officers he supervised. He acknowledged that the different JPD shifts had "friendly competition over arrests." Lieutenant Story agreed that he had previously asked Defendant to join his shift, but

Defendant declined. Lieutenant Story noted that it was Defendant's choice where he wanted to work.

Lieutenant Story testified that, in his experience, DUI traffic stops not involving a crash usually concluded within one hour. He noted that, in twenty-three years on the job, he had not dealt with a DUI case involving a JPD officer. Lieutenant Story agreed that, if an investigating officer concluded that a JPD officer was not under the influence, the investigating officer would not be required to notify a supervisor of the stop. When asked "who put [Defendant] through the [FSTs] to determine that he was impaired and to contact somebody else," Lieutenant Story responded, "I could smell the alcohol on him when I came up to him and tried to talk to him." Lieutenant Story said that he believed one of the other officers documented the alcohol odor and that he did not file a report because he did not conduct the investigation.

On redirect examination, Lieutenant Story testified that evidence was lost as the body metabolized alcohol, making it less likely to obtain an accurate blood alcohol content over time. Lieutenant Story estimated that it took ten to fifteen minutes for him to speak to Sergeant Wright, call the police chief, and speak to dispatch about calling THP. He thought that he called dispatch before 11:50 p.m.

On recross-examination, Lieutenant Story agreed that physical factors like excessive fatigue or a bad knee could "invalidate" the result of an FST. He affirmed that he taught DUI investigation using "the National Highway Traffic Safety Administration book." He stated that he taught officers to ask a person what medications they took, what they had been doing recently, and whether they had physical impairments before conducting FSTs. Lieutenant Story testified that he used his discretion not to charge Defendant with possessing a firearm while intoxicated, even though Defendant had several guns in his truck.

Trooper Fason testified that, on September 16, 2021, at 11:53 p.m., JPD requested that she assist them with a traffic stop, which was unusual. Upon her arrival, Lieutenant Story and a sergeant approached her, and Lieutenant Story asked if she would help them with a DUI investigation of a JPD employee. Trooper Fason did not remember how long the conversation lasted or where Defendant was located at that time. Trooper Fason testified that the situation was "odd" because she was "getting pieces [of information] from different people" when she arrived. She noted that it was one of her first "encounters" with a JPD DUI investigation and with an off-duty police officer.

Trooper Fason testified that she asked Defendant if he would do FSTs, and he agreed. She stated that, although she did not remember how long it took for Defendant to complete the FSTs, she recalled giving three standard tests and an additional "Romberg" test.

- 14 -

Trooper Fason testified that, when she first spoke to Defendant, she noticed that he was unsteady on his feet and had "bloodshot, watery eyes." She added that, during the FSTs, she could smell alcohol when Defendant spoke. Trooper Fason stated that she presented Defendant with an implied consent form; she noted that she did not read it to him because he was a police officer who performed DUI investigations. She stated that Defendant signed the form and denied consent for "chemical testing," after which she transported him to the jail.

On cross-examination, Trooper Fason testified that she began working with THP in September 2020; she did not know how many DUI arrests she made in the year preceding Defendant's arrest. She agreed that the totality of the circumstances, one of which was FSTs, assisted her in making a probable cause determination for DUI.

Trooper Fason clarified that, upon arriving at the scene, Lieutenant Story told her that they needed assistance "to observe" Defendant and that he did not specify that it was a DUI investigation. Trooper Fason noted that she did not know why she was there when she first arrived. Trooper Fason recalled that one of the officers told her they needed her to take over the investigation, but she did not remember at what time this occurred.

Trooper Fason testified that THP did not have body cameras in September 2021. She stated that, generally, FSTs took less than fifteen minutes to complete. Trooper Fason agreed that a bad knee or severe fatigue could affect performance on FSTs and that an officer should ask a person questions about these factors before conducting them. Trooper Fason acknowledged that she was on scene for thirty-three minutes before speaking to Defendant and beginning the FSTs. Trooper Fason agreed that she did not see Defendant's driving or watch the video recording of it prior to conducting the FSTs. Trooper Fason stated that she would be surprised to learn that Defendant had never made a DUI arrest.

The trial court orally denied the motion to suppress. After the trial, the trial court entered a written order containing the following findings of fact and conclusions of law:

1) The [c]ourt [finds] the testimony of Officer Paul Hugueley, Sgt. Lance Wright and Lt. Steven Story with the Jackson Police Department and the testimony of Trooper Jalita Fason with the Tennessee Highway Patrol as credible and that they reasonably suspected [Defendant], a fellow Jackson police officer, of driving under the influence based on specific, articulable facts.

2) The [c]ourt cited *State v. Graves*, No. [W2021-01405-CCA-R3-CD], 2023 WL 3116656 (Tenn. Crim. App. Apr. 27, 2023), as a recent Madison County case that involved a similar situation. The time lapse was 42 minutes in []

- 15 -

*Graves*, and in this case the time lapse was about 1 hour and 26 minutes until the [FSTs] were performed.

3) Considering the totality of the circumstances, the [c]ourt finds that this case, unlike [] *Graves*, was not a fishing expedition. There were specific articulable facts that [] Defendant was suspected of driving under the influence. There was testimony of erratic driving, the smell of alcohol, no lights, unsteady on the feet and watery eyes. This is distinguished from [] *Graves*.

4) The [c]ourt note[s] that the officers were acting in good faith, they simply had never stopped a fellow officer. The [c]ourt note[s] that hindsight is 20/20 and officers certainly could have done things differently and much more expeditiously.

5) The [c]ourt finds that the officers simply did not know how to handle the arrest of a fellow officer and were trying to avoid the appearance of bias.

6) The [c]ourt also agree[s] with the State's argument that the delay did not prejudice [] Defendant but obviously should have been handled quickly.

7) For these reasons, the [c]ourt decline[s] to exclude evidence and testimony regarding matters observed during the allegedly prolonged traffic stop— including [Defendant's] performance on the [FSTs]—and decline[s] to dismiss the charges.

*B. Trial*

At trial, Officer Hugueley's dashboard and body cameras and Trooper Fason's dashboard and backseat cameras were admitted as exhibits. Officer Hugueley's testimony was generally consistent with his suppression hearing testimony. He added that, at the time of the incident in this case, he had been working with JPD for about eight months. Officer Hugueley stated that the bottle in Defendant's backseat contained alcohol.

On cross-examination, Officer Hugueley testified that, at the time of the traffic stop, he did not know that JPD had previously investigated its own officers in criminal cases. Officer Hugueley said, "I'm under the understanding that I have a duty to report any off-duty" JPD officer for criminal acts. He acknowledged, though, that he had never seen such a rule in writing and that no one had "specifically ordered" him not to investigate another officer. Officer Hugueley agreed that none of Defendant's supervisors were called to the scene.

Officer Hugueley testified that, when Defendant exited his truck, he walked to Officer Hugueley's police cruiser "pretty good." Officer Hugueley stated that he thought he remembered Defendant's "falling out of his truck," but he later said that Defendant did not fall out of the truck. After reviewing his report, Officer Hugueley, acknowledged that he had written the phrase "as if he fell out" when referring to Defendant's exiting his truck.

Officer Hugueley testified that he would not arrest someone for DUI based solely upon erratic driving. Officer Hugueley stated that his investigations usually took about thirty minutes; he said that he "[p]robably" had no stops that lasted more than an hour. He agreed that, in a normal situation, FSTs did not take a long time. Officer Hugueley agreed that he never saw Defendant sit and that he never offered to let Defendant sit down.

Officer Hugueley agreed that Defendant used his turn signal at the red light, that he pulled over immediately when Officer Hugueley activated his blue lights, and that Defendant did not "run anybody off the road" or cause property damage. Officer Hugueley stated that he never smelled alcohol on Defendant.

When asked whether he had decided that Defendant was under the influence before he exited the truck, Officer Hugueley stated, "I was investigating that, yes, sir." Officer Hugueley read from his police report that he could tell Defendant was "under the influence of something from his slow movements and lack of communication[.]" Officer Hugueley acknowledged that he did not turn on his body camera during the initial interaction, although he was supposed to do so.

When shown the suppression hearing transcript containing his statement that Defendant was "real talkative," Officer Hugueley suggested that he might have meant to say that Defendant was "not real talkative" or that the court reporter made a transcription error. Officer Hugueley stated that, when Trooper Fason arrived, she spoke with Lieutenant Story but did not speak to him.

Officer Hugueley did not complete an inventory form for Defendant's truck or collect the bottle of alcohol. He agreed that he did not know if the bottle was open, how long it had been in the truck, or whether Defendant had been drinking from it. Officer Hugueley agreed that Defendant asked for his truck to be towed but that the officers did not tow it.

On redirect examination, when asked why he did not cite Defendant for failure to maintain lane, Officer Hugueley responded, "I thought I was doing him a favor not charging him with that in addition to the other issues that he had coming." He stated that they did not tow Defendant's truck to save him money and so that Defendant's personal property would not have to be removed from it.

Officer Hugueley testified that, during the initial stop, Defendant handed Officer Hugueley his identification "without really even looking at [him]." Officer Hugueley stated that he had discretion to remove someone from the road who could cause an accident.

Trooper Fason testified consistently with her suppression hearing testimony. Trooper Fason stated that Lieutenant Story briefed her on the situation for about seven minutes and that she called her sergeant on duty. She stated that, at one point, she was "waiting on them to have [Defendant] come back" to where she was standing to begin the FSTs.

Trooper Fason testified that Defendant spoke quietly and that, when she leaned in to hear him, she smelled alcohol on his breath and realized that his speech was slurred. She later added that Defendant had a "glazed look" to his eyes. Trooper Fason stated that she asked Defendant to complete two standard FSTs and two additional FSTs; she explained that her practice was to be thorough before arresting someone.

Trooper Fason testified that because Defendant was a JPD officer "who was fit for duty," she assumed that he had no medical issues that would impact the FSTs, and she did not ask him about his health. Trooper Fason stated that Defendant exhibited four characteristics of impairment during the "walk-and-turn" test, which was two more than she needed to conclude a person was impaired. She said that the "one-leg" test's characteristics of impairment were swaying side to side, hopping on one foot, putting the elevated foot down, and using the arms for balance. Trooper Fason testified that she used a "modified Romberg" test, in which she asked Defendant to close his eyes for what he thought was thirty seconds, to determine if his impairment was the result of ingesting a depressant or a stimulant. She stated that Defendant closed his eyes for seventy-four seconds, which indicated that he had used a depressant and that Defendant had "body tremors" and swayed back and forth. Trooper Fason also asked Defendant to recite the alphabet; she said that he performed "poorly" and that he "stopped at P, . . . said J and then paused and stopped." Trooper Fason said that Defendant started again and stopped after C; when she asked him if he could finish, he answered, "Negative."

Trooper Fason testified that she concluded Defendant was under the influence and that she spoke to Lieutenant Story and told him that she would "take" Defendant if JPD did not. After contacting her sergeant and being told to "take care of business," she told the JPD officers that she could proceed with the investigation, upon which she arrested Defendant. Trooper Fason said that she asked the officers to retrieve Defendant's cell phone from the truck and that she placed Defendant in her police cruiser.

On cross-examination, Trooper Fason acknowledged that she did not have the opportunity to observe Defendant's behavior at the time he was pulled over or ask him where he had been and whether he had anything to drink. Trooper Fason agreed that her

information primarily came from Lieutenant Story. She agreed that fatigue could resemble intoxication.

Trooper Fason denied that anyone told her that Defendant had been standing up for one hour and twenty-five minutes prior to beginning the FSTs. Trooper Fason stated that, depending on the situation, she would hope to finish a DUI traffic stop in thirty-three minutes. She agreed that her direct interaction with Defendant was eight minutes long.

Trooper Fason did not remember if any of the JPD officers told her that Defendant smelled of alcohol or that Officer Hugueley did not smell alcohol before she began the FSTs. She agreed that she should treat police officers the same as anyone else. Trooper Fason acknowledged that FSTs were subjective and that an initial interaction was "one of the things that's important" in determining whether the person was impaired. She recalled speaking to Officer Hugueley "to get the transfer of PC, why he stopped him, what was his driving behavior[.]" Trooper Fason deferred to the recording as to whether Lieutenant Story answered for Officer Hugueley during the conversation. Trooper Fason noted that, sometimes, an odor of alcohol was not apparent until she was close to a person during the FSTs. She stated that various factors would influence whether she could smell alcohol from a passenger-side window. Trooper Fason testified that, although she was permitted to apply for a warrant to obtain a sample of Defendant's blood, she did not do so in this case.

On redirect examination, when asked why she did not apply for a warrant, Trooper Fason testified that Defendant refused a blood test. She explained that the common practice in West Tennessee at the time gave her discretion to obtain a warrant for the sample or take Defendant to jail. She noted that they "had already been out there for some time, and [she] was ready to wrap the case up." Trooper Fason stated that her training indicated that impairment diminished over time. She noted that, in Madison County, she generally applied for search warrants in DUI cases involving injury or death.

Trooper Fason testified that, in previous cases, she had performed FSTs and determined that a driver was fatigued, not intoxicated. She noted that, when the scoring was combined, FSTs were 91% accurate and that she also considered a person's movements, speech, appearance, and odor.

On recross-examination, Trooper Fason acknowledged that the implied consent law required that she read a refusal form to Defendant. Trooper Fason testified that she began to read Defendant the form, that he said, "Negative," and that she assumed that "as a police officer who works night shift, he automatically knew what implied consent [was.]" She acknowledged, though, that she should have read him the form. Trooper Fason noted that West Tennessee magistrates did not work at the jail overnight and had to be called at home. Trooper Fason commented that Defendant "also had the option to accept implied consent

- 19 -

that night[.]" She agreed that it was ideal to have a person's blood drawn within thirty minutes of a stop, which was not always possible. Trooper Fason stated that JPD could also have applied for a warrant when they stopped Defendant.

On further redirect examination, Trooper Fason testified that, after Defendant declined the blood draw, she told him, "Okay. Well here is the implied consent form. If you'll sign under *Refuse*," and he said, "okay," before signing the form.

Sergeant Wright testified consistently with his suppression hearing testimony. On cross-examination, Sergeant Wright stated that, the day after Defendant's arrest, he addressed a rumor that Defendant had been "rude and unprofessional" during the stop. Sergeant Wright told the officers that Defendant was "very polite and cordial during the entire interaction." He did not recall saying that Defendant was "not drunk and belligerent."

Sergeant Wright testified that, per JPD policy, a supervisor was to be notified if another officer was "involved in improper or criminal activity." He acknowledged his previous testimony that no such policy existed but explained that his previous testimony was incorrect. Sergeant Wright stated that JPD treated everyone equally when investigating crimes. He maintained that, although Officers Hugueley and Michael were trained and able to conduct FSTs, JPD policy stated that they were to contact a supervisor. Sergeant Wright acknowledged his previous testimony that he would not have been disciplined for conducting Defendant's FSTs.

Sergeant Wright testified that he did not tell Defendant to sit down during the stop or ask whether he needed to sit; he disagreed, though, that Defendant was not allowed to sit. Sergeant Wright acknowledged that, normally, when a driver declined to participate in FSTs, an officer would determine whether to arrest them, which did not occur in this case.

Lieutenant Story testified consistently with his suppression hearing testimony. He described Defendant as lethargic and said that Defendant's speech was slow. When asked why he did not conduct FSTs, Lieutenant Story stated,

> Once I realized that we had enough reasonable suspicion to conduct the investigation, my protocol is I have to call the command staff, which I called the chief, advised him what was going on. He advised that he would prefer us to be unbiased in the situation and either have Madison County or THP come and handle it, if they could. If not, then I would have been handling it all.

Lieutenant Story agreed that Defendant did a good job as an officer and made "a bunch of arrests." Lieutenant Story identified a document containing the arrests made by each JPD officer in 2021; Defendant made 158 arrests, which was the highest number.

When asked about with his previous testimony that it "would be almost impossible to make a determination during a properly administered [FST] in eight minutes," Lieutenant Story testified, "Eight to ten minutes for the whole entire [set of] test[s] would not be sufficient, but that doesn't mean it can't be determined. The [horizontal gaze nystagmus test] alone can determine if you're impaired or not."

Lieutenant Story agreed that, if an officer did not ask questions about a driver's physical health, "it pretty much invalidates" the FSTs. He elaborated that an officer needed to know whether to "actually do the test or not." Lieutenant Story stated that he "left it up to Sergeant Wright" to have Defendant's truck towed or drive it to his home.

After the State closed its proof, Defendant presented witnesses on his behalf. Shawn Dill testified that, on September 15, 2021, he was at Defendant's home because they were building a table for Mr. Dill's daughter and son-in-law. Mr. Dill stated that, around 5:00 p.m., a baby squirrel fell from a nest in the ceiling of Defendant's workshop. Defendant and his son had previously cared for squirrels, so Defendant called his son, and they began feeding it every twenty or thirty minutes using a syringe. Mr. Dill left around 9:00 or 9:30 p.m. and did not return the following day. He acknowledged that he did not see Defendant on September 16, 2021.

Brenden Allen testified that he was Defendant's son; he was nineteen years old at the time of trial. Mr. Allen said that, on September 15, 2021, his father informed him about the injured baby squirrel. He noted that his great grandmother, grandmother, and mother all rehabilitated injured animals and that he also had experience in doing so. Mr. Allen gathered supplies to care for it, and he tended to it until he had to go home at 9:00 p.m., at which time Defendant took over feeding it. Mr. Allen instructed Defendant to feed the squirrel every thirty to forty-five minutes because it had an injury to its stomach.

Mr. Allen testified that, when he left the house the next morning, Defendant had been awake caring for the squirrel all night. He said that no one was home aside from Defendant. Mr. Allen stated that he returned home around 3:00 p.m. and took over caring for the squirrel. He said that Defendant went to the gym around that time, came home, and later left for dinner at a friend's house at an unspecified time.

Melissa Hill testified that she was a manager at a Planet Fitness gym. She stated that Defendant scanned his membership card to enter the gym at 3:42 p.m. on September 16, 2021; the gym did not document when members left.

- 21 -

JPD Officer Kurtis Krohn Stowe testified that he and Defendant were "hired in" and attended the police academy together. They also worked the night shift together for a time, although Officer Stowe was working day shift at the time of Defendant's arrest. Officer Stowe stated that his focus on the night shift was "run[ning] warrants" and performing traffic stops "leading to multiple arrests." Officer Stowe said that his DUI training indicated that a person who was awake for more than twenty-four hours could appear similarly to someone whose blood alcohol content was higher than .08; he noted that a person with high blood sugar could smell like alcohol.

Officer Stowe testified that, a couple of months after Defendant's arrest, he asked Lieutenant Story how the case was going. He said that Lieutenant Story stated, "Well, when we were out there, I offered him help," and "I had made up my mind he was either going to go with THP or I was going to take him [to jail] myself." On cross-examination, Officer Stowe testified that Defendant received the same DUI investigation training he did.

Upon this evidence, the jury convicted Defendant of DUI. The trial court imposed a sentence of eleven months, twenty-nine days, suspended to the mandatory minimum of forty-eight hours; the court held the sentence in abeyance pending appeal. Defendant filed a premature notice of appeal on the same day as his motion for new trial. Thereafter, the trial court entered a written order denying the motion to suppress, which contained the same reasoning upon which it had orally denied the motion. The following day, the trial court denied the motion for new trial, and Defendant filed an amended notice of appeal to incorporate the trial court's order denying the motion to suppress. *See* Tenn. R. App. P. 4(e) (stating that a notice of appeal filed prior to the trial court's ruling on a timely motion for new trial "shall be deemed to be premature and shall be treated as filed after the entry of the order disposing of the motion and on the day thereof").

### III.   *Analysis*

#### A. *Motion to suppress*

On appeal, Defendant contends that the trial court erred by concluding that the delay in the traffic stop before Trooper Fason arrested him was reasonable, arguing that (1) the trial court applied a "subjective 'good faith' test to decide whether" the length of stop was reasonable; (2) the length of the stop was objectively unreasonable; and (3) the trial court erred by concluding that the delay did not "necessarily" prejudice Defendant. The State responds that the stop "ripened" into an arrest once the JPD officers had probable cause to arrest Defendant, which was when Sergeant Wright spoke to Defendant approximately twenty minutes after the stop. The State argues in the alternative that the length of the detention was reasonable under the circumstances. Defendant responds that the State waived its probable cause argument for failing to raise it in the court below.

- 22 -

When reviewing a trial court's denial of a motion to suppress, this court is bound by the trial court's findings of fact, credibility determinations, the weight and value of the evidence, and resolution of conflicts in the evidence unless the evidence preponderates otherwise. *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).[6] Additionally, this court affords the party prevailing in the trial court "the strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)). "Nevertheless, '[d]espite the deference given to [the] trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness." *State v. Singh*, 684 S.W.3d 774, 786 (Tenn. Crim. App. 2023) (quoting *State v. Henry*, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017)); *see State v. Montgomery*, 462 S.W.3d 482, 486 (Tenn. 2015). "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution prohibits unreasonable searches and seizures. Traffic stops "constitute seizures entitling a vehicle's occupants to the full protections of the United States and Tennessee Constitutions[.]" *State v. Brotherton*, 323 S.W.3d 866, 870 (Tenn. 2010) (internal citations omitted). A warrantless seizure "is presumed unreasonable and evidence seized thereby is subject to suppression, unless the State establishes one of the recognized exceptions to the warrant requirement." *State v. Dotson*, 450 S.W.3d 1, 50 (Tenn. 2014) (citing *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014)).

One recognized exception to the warrant requirement "exists when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Binette,* 33 S.W.3d 215, 218 (Tenn. 2000) (citing *Terry v. Ohio*, 392 U.S.1, 20-21 (1968); *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997)). "Determining whether reasonable suspicion exists in a particular traffic stop is a fact-intensive and objective analysis." *State*

---

[6] In Defendant's principal brief, he states, "When a trial court's factual findings at a suppression hearing are based in large part on video proof and not on matters of witness credibility, this [c]ourt 'must examine the record de novo without [applying] a presumption of correctness' to the trial court's findings of fact," quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). The State disputed this statement, and Defendant clarified in his reply brief that it was meant as a "description of the *various* standards of review that *might* be implicated in this appeal." (emphasis in original). The *Binette* standard of review only applies "when a court's findings of fact at a suppression hearing are based *solely* on evidence that does not involve issues of credibility[.]" *Id.* (emphasis added). Because this case involves both recordings and a large quantity of witness testimony, we will apply the *Odom* standard of review set forth above. *See State v. Hafer*, No. E2018-02076-CCA-R9-CD, 2020 WL 918653, at *3 (Tenn. Crim. App. Feb. 26, 2020) (applying the *Odom* standard of review to a case in which the interaction between the defendant and the arresting officer was recorded, but the officer also testified at the suppression hearing), *no perm. app. filed.*

*v. Day*, 263 S.W.3d 891, 903 (Tenn. 2008). "'[R]easonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause' and 'can arise from information that is less reliable than that required to show probable cause.'" *State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting *Day*, 263 S.W.3d at 903)).

"Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." *State v. Smith*, 484 S.W.3d 393, 400 (Tenn. 2016) (citing *Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979)); *see State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002). If an officer has probable cause or reasonable suspicion to believe that a motorist has committed a traffic offense, an investigatory stop is constitutional. *Id.*

It is undisputed that Officer Hugueley had reasonable suspicion based upon Defendant's erratic driving to conduct an investigatory traffic stop to determine if Defendant was operating a vehicle while his ability to drive was impaired. *See Binette*, 33 S.W.3d at 218; Tenn. Code Ann. § 55-10-401 (stating that it is unlawful for any person to drive on a public road while "[u]nder the influence of any intoxicant . . . that impairs the driver's ability to safely operate a motor vehicle").

The United States Supreme Court has explained that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop [] and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). A detention that is initially reasonable "can become unreasonable and constitutionally invalid 'if the time, manner[,] or scope of the investigation exceeds the proper parameters.'" *State v. Montgomery*, 462 S.W.3d 482, 487 (Tenn. 2015) (citing *Troxell*, 78 S.W.3d at 871; quoting *United States v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001)). "The reasonableness of a seizure . . . depends on what the police in fact do," and "[t]he critical question" is whether a traffic stop is prolonged by the additional investigation at issue. *Rodriguez*, 575 U.S. at 357.

As a preliminary matter, we agree with Defendant that the State did not present its probable cause for an arrest argument in the court below. The State's response to the motion to suppress, as well as its arguments at the suppression hearing, reflect that it characterized the period of time before the FSTs as a detention that was reasonable under the circumstances, not an arrest. We note that Defendant raised his claim of waiver in his reply brief and that the State did not respond to it at oral argument.

Because the State asserted this argument for the first time on appeal, and the trial court did not have the opportunity to address it, we conclude that it has been waived. *See Henry*, 539 S.W.3d at 247; Tenn. R. App. P. 36(a) (stating that relief "may not be granted

in contravention of the province of the trier of fact" and that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Further, the State has not acknowledged that this argument was raised for the first time on appeal or requested that this court consider it in the interests of justice. Because we conclude below that the delay was reasonable, we need not decide whether the constructive arrest argument is significant enough to consider it regardless of waiver. *Cf. Henry*, 539 S.W.3d at 247 (concluding that, although the State waived its argument related to application of the good-faith exception to the warrant requirement to a warrantless blood draw, the State had acknowledged the failure to raise it in the trial court and that it should be considered because of its significance).

Defendant first contends that the trial court erred by applying a "good faith subjective test" when analyzing the reasonableness of the delay, citing the trial court's discussion of the officers' good intentions and their "purported ignorance" of how to handle the investigation themselves. The State responds that the trial court properly considered whether the officers' actions "were taken in furtherance of the mission of the stop."

We do not believe that the trial court unduly focused on the officers' subjective intentions or motivations; rather, the trial court considered the totality of the circumstances, including the officers' statements that they did not depart from the original scope of the stop, which was to investigate a DUI.

Next, Defendant submits that, using an objective standard, the delay was unreasonable based solely on the amount of time that passed because the JPD officers failed to diligently pursue an investigation that was likely to quickly confirm or dispel their suspicion of DUI. Defendant relies heavily upon *United States v. Place* 462 U.S. 696, 709-10 (1983), in which the United States Supreme Court concluded that the seizure of the defendant's luggage for ninety minutes before subjecting it to a dog sniff was unreasonable. In *Place*, the defendant aroused suspicion of drug trafficking in a Miami airport; federal agents telephoned ahead, and when the defendant landed in New York, federal agents there seized his luggage and transported it to a second airport. *Id.* at 698-99. Ninety minutes after the luggage was seized, a drug dog alerted to one of the bags, which contained cocaine. *Id.* at 699.

In concluding that the seizure was unreasonable in length, the Court discussed that it "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 703. The Court emphasized that the "brevity of the invasion . . . is an important factor in determining whether the seizure is so minimally intrusive as to be

justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Id.* at 709. The Court noted, "[A]lthough we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case." *Id.* at 710. The Court noted that, even though it based its ruling solely on the length of the detention, law enforcement knew the time at which the defendant would land in New York and "had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on [his] Fourth Amendment interests." *Id.* at 709.

We also find the United States Supreme Court's opinion in *United States v. Sharpe*, 470 U.S. 675 (1985), to be instructive. In *Sharpe*, the Court noted that *Place* "expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop." *Id.* at 686. The Court stated it had "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* at 685 (citations omitted). The Court also cautioned that courts "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* "The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Id.* at 686-87. The Court concluded that the investigation in question did "not involve any delay unnecessary to the legitimate investigation of the law enforcement officers" and that the defendants had "presented no evidence that the officers were dilatory in their investigation," noting that the delay was "attributable almost entirely to the evasive actions of [one of the codefendants], who sought to elude police as [the other codefendant] moved his Pontiac to the side of the road." *Id.* at 687-88.

The parties assert that the time at issue was the one hour, twenty-six minutes between the initial stop at 11:12 p.m. and when Trooper Fason began the FSTs at 12:38 a.m. However, because Officer Hugueley testified that he would have called for backup before conducting FSTs, the six minutes it took Officer Michael to arrive would have been part of the traffic stop. Accordingly, the delay was one hour, twenty minutes. *See Graves*, 2023 WL 3116656, at *9 (discussing that the temporal detour from the mission of the traffic stop began when the officer stopped writing a traffic citation to converse with another officer who had arrived with a K9 officer to sniff the car).

We acknowledge, as the trial court did, that the JPD officers "certainly could have done things more expeditiously." Although the respective officers individually responded to the scene and consulted their supervisors relatively quickly, the aggregate period of time involved in this stop strains the bounds of what is constitutionally reasonable. *Cf. Sharpe*, 470 U.S. at 688 (holding that a twenty-minute delay of a traffic stop was reasonable "when

the police have acted diligently"); *Montgomery*, 462 S.W.3d at 489 (holding that a fifteen-minute delay of a traffic stop while waiting for backup was reasonable); *see also Graves*, 2023 WL 3116656, at *9 (concluding that a forty-two minute delay was unreasonable when the officer delayed the traffic stop to have a narcotics detection dog sniff the car, the reason for the stop was an unsafe lane change, and no reasonable suspicion of drug activity existed). It is concerning to this court that, other than Lieutenant Story, the JPD officers had little or no knowledge of the procedure to be followed when a fellow officer was suspected of criminal activity, other than having a correct instinct that command should be notified.[7]

However, in the light most favorable to the State, the law enforcement purpose for the stop was to investigate a suspected DUI. Unlike in *Place*, the JPD officers came upon Defendant unexpectedly and had to react to this evolving situation by informing their supervisors and, ultimately, bringing in THP. *Cf. Place*, 462 U.S. at 789. All the supervisors had arrived at the scene by 11:32 p.m., fourteen minutes after the delay began, and Lieutenant Story had been briefed, spoken to the police chief, and contacted police dispatch by about 11:50 p.m., eighteen minutes later. The recordings reflect that the officers were constantly speaking to one another, supervising and speaking to Defendant, and trying to watch the dashboard camera recording of Defendant's driving. Trooper Fason arrived relatively quickly at 12:05 a.m. and was ready to perform the FSTs by 12:17 a.m. The final twenty-one minutes of the delay occurred because Defendant requested to talk again with Lieutenant Story before the FSTs, for which we do not fault the officers. *See Sharpe*, 470 U.S. at 688 (concluding that the delay was reasonable "when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains"). The record supports the trial court's finding that the officers diligently pursued the DUI investigation as the situation changed such that the delay was reasonable.

We note that, unlike other cases in which officers undertake additional investigation outside the scope of the original stop, the JPD officers had reasonable suspicion of DUI at the beginning of the traffic stop, and the investigation prior to the FSTs only served to confirm it. The trial court accredited the police testimony regarding signs of intoxication exhibited by Defendant—Officer Hugueley noticed that Defendant did not want to face him and spoke slowly; Lieutenant Story and Sergeant Wright stated that they smelled alcohol on Defendant; and Defendant told Sergeant Wright he had "a few" drinks. Although Officer Hugueley did not smell alcohol when he pulled over Defendant, he spoke to Defendant from the passenger-side window, whereas Sergeant Wright and Lieutenant Story stood close to him.

---

[7] Defendant maintains that no proof was provided that a policy existed requiring an outside agency to investigate JPD officers accused of wrongdoing. Although he is technically correct, Lieutenant Story testified that JPD policy required him to notify the chain of command, which he did, and the police chief instructed him to have an independent agency investigate, if possible.

- 27 -

Further, law enforcement's purpose for the delay—preserving the integrity of the investigation and avoiding the appearance of bias—is significant. The recordings at the scene reflected that, had JPD conducted the FSTs—which Trooper Fason testified were subjective in nature—conflicts of interest would have arisen. Sergeant Wright had what was clearly a very close friendship with Defendant. Sergeant Wright told Officer Hugueley that he and Defendant had played golf together for years; emphasized to Defendant that he was concerned about him as a friend; stated that all of the JPD officers at the scene wanted to "do right by" Defendant; and told Defendant multiple times that he loved him. Moreover, Lieutenant Story indicated that Defendant had been stopped previously, and Officer Michael believed Sergeant Wright performed that stop.

Defendant avers that Officer Hugueley had no conflict of interest because he did not personally know Defendant. However, it was apparent that Officer Hugueley was also biased. Whether Officer Hugueley was motivated by sympathy for Defendant or fear of negative consequences for himself, he expressed multiple times that he did not want Defendant to go to jail; minimized the seriousness of Defendant's conduct by stating that he needed help rather than being arrested and that Defendant might have made it home safely; stated that he was afraid of becoming the "black sheep" of the department as a result of this incident; and emphatically declined to issue Defendant a traffic citation. We note that Defendant's handing Officer Hugueley his police identification instead of his driver's license speaks to the challenging dynamics at play. We agree with the State that, as a matter of policy, we should encourage "fair and impartial accountability for all members of the community, including police officers" and that, in this case, the government and the public had a substantial interest in having a neutral agency perform the FSTs.

Defendant argues that the JPD officers' explanation about avoiding the appearance of bias is undermined by the fact that they did not "recuse" themselves fully from the investigation before Trooper Fason arrived. The trial court found that the officers did not know how to proceed with the investigation, which is supported by the record. We are mindful of the Supreme Court's admonition to avoid "unrealistic second guessing" of the officers' actions as they reacted to an evolving situation. *See Sharpe*, 470 U.S. at 686. In sum, it was plain that JPD's continuing to investigate this case would have been inappropriate and that the extra time spent to bring in Trooper Fason to perform the FSTs was reasonable.

Finally, Defendant disagrees with the trial court's finding that he suffered no prejudice as a result of the delay, arguing that the most damaging evidence against Defendant was collected after Trooper Fason's arrival. The State's response to the motion to suppress noted that in cases "involving intoxication due to alcohol, delay in conducting standardized field sobriety tests benefits the defendant, not the State." The trial court noted without elaboration that it agreed with the State in this regard. The accredited police testimony supports the trial court's general finding that the amount of alcohol in a person's

bloodstream diminishes over time; moreover, because the delay was reasonable, Defendant is not entitled to relief on this basis.

### B. Opening the door

Defendant contends that the trial court erred by finding that defense counsel opened the door to testimony regarding his refusal to provide a blood sample. The State responds that the trial court acted within its discretion. We agree with the State.

We note, as does the State, that the record does not contain a pretrial motion or specific ruling in which the trial court found that evidence of Defendant's refusing consent would not be permitted. However, we agree with Defendant that there is enough information in the record for us to discern the grounds upon which the trial court excluded the evidence and address Defendant's issue on appeal.

At the suppression hearing, the trial court noted that Defendant had filed a "motion in limine to exclude testimony regarding violation of the implied consent law." Defense counsel noted for the trial court that the State had dismissed the second count of the indictment, violation of the implied consent law, because the parties agreed that "the implied consent form was not properly given." Defense counsel stated that the State wished to "continue to use that" at trial, and he argued against its relevance "because [Defendant] was not properly advised of the consequences[.]" The State responded that the form was relevant to whether Defendant was impaired and that its probative value outweighed any prejudicial effect. The State added, "I don't know about the form. The State nollied the violation of implied consent count because the State could not carry the burden of proof as to advi[c]e of the consequences. That does not diminish the fact that . . . Defendant was offered and refused to take a test." The trial court found without elaboration that, although the evidence "might be relevant, . . . [u]nder Rule 403 it should be excluded."

At trial, during Trooper Fason's cross-examination, the following exchange occurred:

> [DEFENSE COUNSEL:] Trooper, please, I want to ask a very pointed question. You have been trained and you are aware that Tennessee law allows you as a police officer, trooper, law enforcement officer, to apply to a judge after a DUI stop to allow you to take a blood test from that individual, right?
>
> [TROOPER FASON:] Yes, sir, that's correct; optional, yes, sir.
>
> [DEFENSE COUNSEL:] You did not do that in this case, correct?

- 29 -

[TROOPER FASON:] That's correct.

[DEFENSE COUNSEL:] And just so we understand, blood tests are taken to determine the exact amount of alcohol in a person's blood at that time. Is that accurate?

[TROOPER FASON:] Yes, sir, that's correct.

[DEFENSE COUNSEL:] And depending on that level, the law then presumes you were intoxicated. You agree?

[TROOPER FASON:] Yes, sir.

At this point, the prosecutor approached the bench, and the following discussion occurred out of the hearing of the jury:

THE COURT: I think I know where this is going.

[THE STATE]: I appreciate you letting me come up before I ask the question. I intend to ask about why she did not seek a search warrant and her answer. I just want to do that on the record. I wanted to have this . . .

[DEFENSE COUNSEL]: Judge, that's why I asked that in the manner I asked it, very pointedly, very even. If there is a refusal, an --

THE COURT: No, I agree.

[THE STATE]: That's not what she said. I would like to ask her why. What her answer is is what her answer is.

THE COURT: I think she's got a right to ask that.

[THE STATE]: That door is opened.

[DEFENSE COUNSEL]: They should -- No, no open door here. There's no open door here. They should have instructed this witness not to mention a test refusal.

THE COURT: There was no mention of that.

[THE STATE]: I did until this point.

THE COURT: There was no mention of the testing.

[DEFENSE COUNSEL]: I agree 100 percent, but if she mentions it now, it's in violation of that order.

THE COURT: The door has been -- I think she -- You asked the question, do you have the right to go to a judge and get an order for the testing, and I think the State's got a right to follow up on that.

[DEFENSE COUNSEL]: Except, it doesn't matter whether they went forward. It doesn't matter whether they refused it, didn't refuse it.

THE COURT: No, I agree with you. I agree with you.

[DEFENSE COUNSEL]: Then it's not relevant. It is not relevant because --

THE COURT: The question was, and you asked a pointed question: You understand the law in this state allows you as law enforcement to go and . . . apply to a judge for an order to get the test, and she says yes.

[DEFENSE COUNSEL]: But that has --

THE COURT: She didn't do that in this case. That was --

[THE STATE]: And if I may, Your Honor, the law allows for application of the search warrant after seeking consent once refused.

[DEFENSE COUNSEL]: But again, Your Honor, it doesn't . . . suggest refusal. It doesn't suggest there was not a refusal, and it doesn't matter that . . . there was a refusal as to whether or not they obtain a warrant.

THE COURT: She can ask the question. You asked this question. You opened the door. I mean, I think the State's got a right to follow up with this.

[DEFENSE COUNSEL]: Respectfully, I don't think I opened the door to a test refusal question.

[THE STATE]: My question to her will be why. I simply do not know what her answer will be, but I wanted to raise this before I asked.

THE COURT: I think you can ask. There may be other people down the road that have a different opinion than I do.

[DEFENSE COUNSEL]: Understand, Your Honor.

On redirect examination, Trooper Fason testified that she did not apply for a search warrant because Defendant refused consent for a blood draw. Defense counsel renewed his objection. The trial court noted, "We had this prior hearing. This implied consent, after it was nollied, I ruled in your favor and said, no, it's not coming in unless . . . the door is opened, and it was opened." The prosecutor stated for the record that, before trial, she had asked Trooper Fason not to mention that Defendant refused consent for the blood draw.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion[.]" *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 states that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. *See* Tenn. R. Evid. 402. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

"Even if evidence is inadmissible, a party may 'open the door' to admission of that evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). Our supreme court has explained, "When a party raises a subject at trial, the party 'expand[s] the realm of

relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039.1). "In short, 'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *Id.*

This court has recently explained,

"[O]pening the door is a doctrine intended to serve fairness and truth-seeking." *State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020) (citing *Ramirez v. State*, 739 So.2d 568, 579 (Fla. 1999)). Accordingly, "the remedy sought after a party has opened the door should be both relevant and proportional." *Id.* at 250-51. "The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door." *Id.* at 251 (citing *State v. Gaudet*, 97 A.3d 640, 646 (N.H. 2014)).

*State v. Forte*, No. E2022-01216-CCA-R3-CD, 2025 WL 1420366, at *19 (Tenn. Crim. App. May 16, 2025), *no perm. app. filed*.

The trial court did not abuse its discretion by finding that defense counsel's question opened the door to allow the State to elicit that Defendant refused consent for a blood draw. We agree with the State that defense counsel's eliciting that Trooper Fason did not seek a search warrant for a blood sample created a misleading inference that a poor investigation explained the lack of a blood test. The trial court allowed the State to correct that inference by asking why Trooper Fason declined to seek a warrant. *See Vance*, 596 S.W.3d at 251 (internal citation omitted). Trooper Fason's answer was brief, and defense counsel was permitted to cross-examine her about her failure to explain the implied consent form to Defendant. We note that Trooper Fason's explanation on redirect and cross-examination was not necessarily favorable to the thoroughness of her investigation—she implied that she did not want to wake a magistrate, stated that JPD could also have applied for a warrant, and said that she "was ready to wrap the case up." We further note that, even if this ruling were in error, it would be harmless in light of the overwhelming video and testimonial evidence of Defendant's intoxication. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (stating that evidentiary errors are examined using a harmless error standard, in which "the defendant bears the burden of showing that the erroneous evidence 'more probably than not' affected the verdict") (quoting Tenn. R. App. P. 36(b)). Defendant is not entitled to relief on this basis.

## IV.     Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE